HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
                                   AT SEATTLE
8
9  COSTCO WHOLESALE CORPORATION,
10                 Plaintiff,                    CASE NO. C13-1207RAJ
11         v.                                    ORDER
12  AU OPTRONICS CORPORATION, et al.,
13                 Defendants.

## I.  INTRODUCTION

14
15        This matter comes before the court on a motion for summary judgment from

16  Defendants Au Optronics, Chi Mei, Hannstar, and LG Display.[1]  Defendants requested

17  oral argument, but the court finds oral argument unnecessary.  For the reasons stated

18  herein, the court DENIES the motion.  Dkt. # 484.

## II.  BACKGROUND OF MULTIDISTRICT LITIGATION

19
20        Today the court considers for the first time the merits of the price-fixing claims

21  that Costco will soon present to a jury.  The motion this order resolves concerns what the

22  court will call the "control exception" to the general rule of *Illinois Brick Co. v. Illinois*,

23
24  ---
[1] With the exception of Hannstar, each of the remaining Defendants is a group of at least two
25  entities.  The parties know who belongs to each group of Defendants, and the court simplifies its
    discussion by referring to each group of Defendants as a single Defendant and not reciting most
    parties' full corporate names.
26
           On August 28, after briefing on this motion was complete, the court received a letter from
27  counsel for Hannstar announcing a settlement of Costco's claims against Hannstar.  No one has
    formally confirmed that settlement, and the court will treat Hannstar as a Defendant until the
    parties file a confirmation of that settlement.
28  ORDER – 1

431 U.S. 720 (1977), that only direct purchasers of price-fixed goods or services have standing to sue for federal antitrust damages.  Before considering the control exception, however, the court remarks on its role in this case.

This case is one of dozens that the Judicial Panel on Multidistrict Litigation assigned to the Honorable Susan Illston in the United States District Court for the Northern District of California (the "MDL court") for coordinated pretrial proceedings. All of the MDL cases arise from a conspiracy allegedly spanning nearly a decade to fix the prices for thin-film transistor liquid crystal display panels ("TFT-LCD panels" or "panels").  There are allegedly many conspirators, and the conspirators themselves allegedly relied on a complicated web of corporate parents, subsidiaries, joint ventures, and other related entities to effectuate the conspiracies.  The preceding sentences do not begin to describe the MDL court's gargantuan task.  There are more than 9,000 entries on the MDL court's docket, more than 8,000 of which came before the MDL court suggested that the JPMDL transfer Costco's case back to this court for trial.  The MDL court itself has presided over civil and criminal trials, and prepared others for trial in the courts in which they originated.

This case is among those that the MDL court prepared for trial.  Costco, which opted out of participation of a class of direct purchaser plaintiffs that first sued in late 2006 and that the MDL court certified in March 2010, sued more than a dozen groups of Defendants, contending that as a result of their conspiracy, it paid too much for finished products incorporating the price-fixed TFT-LCD panels.

Defendants resisted Costco's claims vigorously in the MDL court.  Defendants filed dozens of dispositive motions on a schedule that the MDL court set.  In rulings on those motions, the MDL court pared Costco's claims, but did not completely resolve them.  In July 2013, the JPMDL returned Costco's suit here, to the district in which it originated, for trial.

ORDER – 2

The parties initially agreed that their claims were ready for trial.  After the court set a trial schedule, adopting the parties' suggestions as to deadlines for pretrial filings, Defendants changed their mind about the case's readiness for trial.  They requested leave to file two summary judgment motions.  Accepting as at least colorable Defendants' representations that these motions were necessary despite the MDL proceedings, the court permitted the motions.

After reviewing those motions, it seems that Defendants view this court as part trial court sequel, part court of appeals.  They ask the court both to revisit the MDL court's rulings and to permit them to request summary judgment on issues that they neglected to present in dispositive motions before the MDL court.  This court, however, is not the court of second chances that Defendants seem to envision.  This court is continuing the MDL court's pretrial work into trial, and it will rule accordingly.

### III.   ANALYSIS OF CONTROL EXCEPTION MOTION

**A.**   ***Illinois Brick* and the Control Exception**

*Illinois Brick* generally confers statutory standing to recover for antitrust injuries only on plaintiffs who purchase products directly from a defendant who violates the antitrust laws.  Customers who buy lemonade from a neighborhood stand cannot sue farmers who conspire to fix the prices of lemons, even if they paid more for lemonade. *Illinois Brick* dictates that if anyone is to privately enforce the antitrust laws, it must be the direct purchasers of the price-fixed lemons – in this example the operators of the lemonade stand.

As a general rule, general rules have exceptions, and the *Illinois Brick* rule is no different.  Among those exceptions is the control exception, which in its simplest form confers standing on an indirect purchaser who purchases goods from a direct purchaser under the control of a price fixer.  If Lemons, Inc. conspires with other growers to fix lemon prices, and sells lemons to its wholly-owned subsidiary, Lemonade, Inc., customers of Lemonade can sue Lemons to recover the overcharge they paid for

ORDER – 3

lemonade.  Indeed, even if Lemonade buys its lemons solely from one of Lemons's conspirators (an entity with no control over Lemonade), Lemonade's customers may sue the conspirator directly because it conspired with Lemonade's corporate parent to fix lemon prices.  Courts, particularly the Supreme Court, have been reluctant to carve out exceptions to the *Illinois Brick* rule, but one is necessary in instances like these, because there is no realistic possibility that Lemons would permit its subsidiary Lemonade to sue it or one of its conspirators.  Without an exception, there would be no realistic possibility of private antitrust enforcement.  And, without an exception, price fixers and other anticompetitive entities could evade liability simply by incorporating subsidiaries to purchase and distribute their goods to the consuming public.

**B.    Defendants Waived Summary Judgment as to the Timing of the Control Exception By Failing To File a Timely Motion.**

Defendants and Costco hashed out their version of the lemon conspiracy in the MDL court.  Costco did not purchase products containing price-fixed TFT-LCD panels directly from any Defendant.  About 8% of the sales for which it claims damages came from Samsung Electronics America, Inc., which is a wholly-owned subsidiary of Samsung Electronics Corporation, Inc., which was admittedly a participant in the price fixing conspiracy at issue.  The other 92% of sales for which Costco seeks damages came from vendors for whom demonstrating control by a conspirator (or control of a conspirator)[2] is substantially more complicated than the hypothetical lemon market the court has discussed.  Those vendors are Philips Electronics North America, Sharp Electronics Corporation, JVC Americas Corporation, Panasonic Corporation of America, and two United States subsidiaries of Toshiba Corporation.  Considering whether any of these vendors was under control of a conspirator (or, alternatively, whether any of these vendors controlled a conspirator) requires consideration of a host of joint venture

---

[2] Among the MDL court's rulings was that the control exception applies not only when a conspirator controls the entity from which a plaintiff purchased price-fixed goods, but also when that entity controls a conspirator.  Nov. 19, 2012 MDL ord. (Dkt. # 297) at 5.  Defendants believe the MDL's ruling was error, but they do not challenge it in this motion.

ORDER – 4

1    agreements, sales and purchases of stock, and other evidence of corporate control that

2    fluctuated over the course of a conspiracy that Costco claims extended from 1998 until

3    federal law enforcement exposed the conspiracy at the end of 2006.  Control continued to

4    fluctuate after the exposure of the conspiracy.

5         Defendants invite the court to trace the web of control for each of Costco's

6    vendors to arrive at the conclusion that, as a matter of law, Costco cannot establish the

7    control exception for all or a significant portion of its purchases from those vendors.  But

8    Defendants already extended a version of that invitation to the MDL court, which that

9    court declined.  The MDL court found genuine issues of material fact as to the

10   application of the control exception to Costco's purchases from Panasonic and JVC.

11   Dec. 26, 2012 MDL ord. (Dkt. # 299).  The MDL court did, however, grant summary

12   judgment that Costco could not establish the control exception as to purchases from at

13   least seven other vendors.  *Id.*

14        Defendants insist that the court can grant summary judgment where the MDL

15   court did not because they have a new argument: that the control exception depends not

16   only on a conspirator's control over the entity from whom the plaintiff purchased the

17   product, but also on showing that a conspirator had control on the day the plaintiff sued.

18   As an example, Defendants contend that Philips owned half of LG Display until late

19   2004, then owned a successively decreasing minority interest until March 2009, and

20   thereafter owned no portion of LG Display.  Regardless of when Costco purchased

21   products containing TFT-LCD panels, Costco did not sue over those purchases until the

22   last day of November 2010.  In Defendants' view, because Philips did not control LG

23   Display on that day, Costco cannot establish the control exception as a matter of law.

24   Defendants advocate a simple rule: a plaintiff seeking to recover for indirect purchases

25   must establish that the entity from which it purchased price-fixed goods was within the

26   scope of the control exception on the day the plaintiff sues.  Control at any other time is,

27

28   ORDER – 5

in Defendants' view, insufficient as a matter of law. The court will refer to Defendants' proposal as the date-of-suit rule.

Putting aside the merits of the date-of-suit rule, Defendants have no adequate justification for waiting to announce it until after the MDL court completed summary judgment rulings. The justification they offer is that they did not realize that they should advocate that rule until they considered Costco's responses to their summary judgment motions. That is almost certainly inaccurate. Costco points out that Defendants first raised issues relating to the timing of control in their reply brief on a summary judgment before the MDL court, and Defendants again raised the issue at oral argument before the MDL court. Defendants do not contest as much, but they contend that they never expressly proposed the date-of-suit rule, although they do not explain why. Even accepting Defendants' assertions at face value, courts typically do not permit new dispositive motions because a party realizes, after a first (or umpteenth) round of dispositive motions, that it could have made other arguments. Pretrial schedules exist in part to announce to parties that they must put their dispositive arguments on the table in a timely fashion, or forego the benefits of a dispositive motion. That, by itself, is a sufficient reason to deny Defendants' motion for summary judgment. The motion is untimely; Defendants should have brought it during the time the MDL court allocated for dispositive motions. If Defendants now wish to prevail by avoiding the control exception, they must do so at trial.

**C.    The Court Will Not Adopt Defendants' Date-of-Suit Rule.**

Defendants' motion requests two forms or relief. One, which the court has already denied, is for an application of the date-of-suit rule to the evidence regarding Defendants' control between Defendants and the vendors from whom Costco made its purchases. The other form of relief that Defendants request is a declaration that the date-of-suit rule is an accurate statement of the law to be incorporated into a jury instruction. Although Defendants' failure to timely move for summary judgment means that they have waived

ORDER – 6

their right to have the court determine if the application of that rule to the evidence demands partial judgment as a matter of law, they have not waived their right to request jury instructions.  Why Defendants believed it was necessary or appropriate to submit a summary judgment motion in addition to the several hundred pages of argument the parties submitted with respect to their jury instruction disputes, the court can only guess.[3]

In considering the validity of the date-of-suit rule, the court looks to the MDL court's rulings.  That is, in the court's view, a necessary result of the MDL process.  The MDL court stood in this court's place for pretrial proceedings.  When this court makes pretrial rulings on issues of law, it does not change those rulings on the eve of trial absent a demonstration of manifest error or an intervening change in controlling law.  The court will take the same approach to the MDL court's rulings.  Any other approach would be antithetical to the MDL process, which is designed to reduce the burden of sprawling multidistrict litigation on the courts and the parties.  The transfer of a case from an MDL court to a trial court is for purposes of applying the MDL court's rulings at trial.  It is not an opportunity for the parties to relitigate factual or legal issues, or to litigate in the first instance issues that they should have raised before the MDL court.

With those comments in mind, the court rejects the date-of-suit rule because it is convinced that the MDL court would have rejected it.  The MDL court considered the control exception both generally and in the context of this price-fixing conspiracy.  Absent manifest error or a change in controlling law, the MDL court's understanding of the control exception is the one that will govern in this litigation.  For example, the court largely omitted legal citations in its discussion in Part III.A of the *Illinois Brick* rule and the control exception.  That is because the MDL court already provided citation when it

---

[3] Neither Defendants' request for a jury instruction nor Costco's response to Defendants' motion addresses a more fundamental issue: the Ninth Circuit has held that "[b]ecause the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination."  *Martinez v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 747 (9th Cir. 2012).  It is not clear to the court why the jury should be instructed as to the control exception or any other aspect of the *Illinois Brick* inquiry into a plaintiff's standing to invoke the antitrust laws.

ORDER – 7

considered the same issues.  This court will not reinvent the wheel.  Although the MDL court did not specifically address the timing of the control exception, its rulings convince the court that it would have rejected Defendants' date-of-suit rule.

First, the court observes that the MDL court was aware of Defendants' evidence and arguments regarding the timing of control.  The MDL court nonetheless denied Defendants' motion for summary judgment as to purchases from Panasonic and JVC.  The MDL court did not expressly address the timing of the control relationships between Defendants and those two vendors, but it was aware of evidence on that issue.  It is not plausible that the MDL court would have accepted the date-of-suit rule.

Second, the MDL court based its rulings on the control exception on a line of Ninth Circuit authority that does not support the date-of-suit rule.  That line of authority began a few years after *Illinois Brick* with *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) and ended with *Brennan v. Concord EFS, Inc. (In re: ATM Fee Antitrust Litig.)*, 686 F.3d 741 (9th Cir. 2012).

The *Royal Printing* court first announced the control exception in this circuit, holding that *Illinois Brick* "does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator."  *Royal Printing*, 621 F.2d at 326.  Driving the court's decision was its recognition that it was unlikely that the direct purchaser would sue, because its "co-conspirator parent w[ould] forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy."  *Id.*  Although the court recognized a "small risk of multiple recovery" stemming from the small chance that a controlled subsidiary might sue, it accepted that risk where its "only alternative [was] to effectively immunize the transactions [before it] from private antitrust liability . . . ."  *Id.*

In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003), the court offered what was arguably an expansion of the control exception – that "indirect purchasers can sue for damages if there is no realistic possibility that the direct

ORDER – 8

purchaser will sue its supplier over the antitrust violation."  In *Freeman*, the court considered a regional multiple listing service ("MLS") that purchased subscriber support services from local associations of real estate agents.  Those local associations owned the MLS and appointed its board of directors.  *Id.* at 1141.  The associations fixed the support fee they charged the MLS, and the MLS charged individual subscribers a fee.  *Id.*  The court held that the subscribers could sue the associations, even though the subscribers did not directly pay the fixed support fee.  When the court concluded that there was "no realistic possibility" that the MLS would sue the associations, it noted that the associations owned the MLS and appointed its board of directors, and that there was thus "no realistic possibility [the MLS] will sue them."  *Id.* at 1146.

In *ATM Fee*, the court concluded that the no-realistic-possibility-of-suit rule from *Freeman* was merely a different way to express the control exception.  In that case, the court considered an ATM network that was at one point owned by its members, which included banks that issued ATM cards.  *ATM Fee*, 686 F.3d at 745.  After the network became a standalone corporation, the card-issuing banks had influence on the network's decisions, but no formal vote or veto power.  *Id.* at 745-46.  ATM cardholders sued, contending that the banks and the network had conspired to fix the interchange fees that banks paid the network for foreign ATM transactions (*i.e.*, transactions in which a cardholder uses an ATM owned by someone other than his or her issuing bank).  *Id.* at 746.  The cardholder plaintiffs did not directly pay the interchange fee, but they alleged that the purpose of fixing that fee was to raise the foreign ATM fee that cardholders paid in those transactions.  *Id.* at 745 (describing interchange fee and foreign ATM fee), at 753 ("Plaintiffs argue that . . . Defendants conspired to fix interchange fees for the purpose and effect of fixing foreign ATM fees.").  The court concluded that Plaintiffs could not take advantage of any exception to *Illinois Brick*, including the control exception.  The court observed that once the network became a standalone corporation, card-issuing banks owned only 10% of its stock, and that ownership of the remainder was widely

ORDER – 9

distributed.  *Id.* at 757.  There was no evidence that the banks dominated the network's board of directors.  *Id.*  The agreement between the network and its members (including the card-issuing banks) gave the members influence over pricing decisions, but left the network with the "ultimate power to change interchange fees based on market conditions."  *Id.*  The network agreed to take input from an advisory board comprised of card-issuing banks, but that board could not control the network's decisions.  *Id.* at 758.

The *ATM Fee* court mentioned the possibility that *Freeman* had created a new exception to *Illinois Brick* for situations in which there was "no realistic possibility of suit" by the direct purchaser against the price fixer.  *ATM Fee*, 686 F.3d at 749.  The court rejected that possibility, concluding that "*Freeman* did not create a new variation of the [control] exception, because *Freeman* relied on ownership and control to find standing."  *Id.* at 756.  The court interpreted *Freeman* to stand for the rule that "whether a realistic possibility of suit exists . . . depends on the existence of ownership or control between the direct purchaser and the seller."  *Id.*

The MDL court provided essentially the same summary of *ATM Fee* and its predecessors.  Absent from the MDL court's orders as well as from Ninth Circuit authority is any mention of a timing rule akin to the date-of-suit rule.  As the court has already noted, Defendants presented timing arguments to the MDL court.  The MDL court acknowledged at least some of those arguments in denying summary judgment as to Panasonic, but espoused no one-size-fits-all timing rule.  The court does not know what arguments the *ATM Fee* defendants presented, but the Ninth Circuit did not announce a timing rule despite incentive to do so.  Members, including the card-issuing bank defendants, controlled the ATM network in *ATM Fee* until February 2001.  *Id.* at 745.  Plaintiffs sought damages dating back to July 2000, but did not sue until July 2004.  *Id.* at 746.  By Defendants' date-of-suit rule, there was no need for the *ATM Fee* court to discuss the banks' former control of the ATM network.  Because the banks did not control the network on the day the cardholder plaintiffs sued, their control was irrelevant

ORDER – 10

(at least according to Defendants' date-of-suit rule). But instead of making that simple pronouncement, the *ATM Fee* court focused on plaintiffs' allegations, concluding that there were no allegations of conspiracy among the bank defendants during the time that they controlled the ATM network. *Id.* at 757 n.10.

The court cannot fully divine the views of the MDL court or the Ninth Circuit on the date-of-suit rule merely because those courts have not mentioned that rule (or another timing rule). The timing of control is surely relevant in some cases, as the MDL court recognized with respect to Panasonic. Returning to the court's hypothetical lemon-product market, lemonade purchasers cannot sue Lemons, Inc. over their purchases from Lemonade, Inc. based purely on evidence that Lemons owned Lemonade years before Lemons's price-fixing conspiracy. But because no court has elevated the timing of control to the make-or-break factor that Defendants advocate, this court will not do so either.

The question that determines the applicability of the control exception, as both the MDL court and *ATM Fee* court articulated it, is whether, *because of control* between a direct purchaser and a price fixer, there is no realistic possibility that the direct purchaser will sue the price fixer. *ATM Fee*, 686 F.3d at 756 ("*Freeman* outlines that . . . whether a realistic possibility of suit exists . . . depends on the existence of ownership or control between the direct purchaser and the seller.") (quoted by MDL court in Nov. 19, 2012 ord. at 5). The timing of control is perhaps relevant to that question, but not always dispositive.

Imagine, for example, that Lemonade, Inc. is the wholly-owned subsidiary of Lemons, Inc. throughout Lemons's participation in a lemon-price-fixing conspiracy. When the conspiracy ends, Lemons spins Lemonade off as an independent corporation. Whether there is a realistic possibility of suit *because of control* in that situation is an open question. Is it realistic that a former subsidiary would sue its former parent for wrongs that occurred while the subsidiary was under its parent's control? Perhaps in

ORDER – 11

some cases, perhaps not in others.  Defendants' date-of-suit rule ignores any nuance.  By Defendants' rule, even if Lemonade had agreed as a condition of the spinoff that it would not sue Lemons for past wrongs, lemonade purchasers could not sue.  By Defendants' rule, even if Lemonade had knowingly acquiesced to paying the fixed price while under Lemons's control, lemonade purchasers could not sue.  By Defendants' rule, even if Lemonade had conspired to fix the price that Lemons charged it while under Lemons's control, lemonade purchasers would have no remedy.

This final hypothetical example is particularly troubling, because it provides a blueprint for price fixers:  conspire with your parent company to fix prices, but also conspire with your parent company to be spun off once the conspiracy is exposed.  Although Ninth Circuit authority is silent as to a catchall rule for the timing of control, it is explicit that no price fixer should be allowed to evade civil liability by manipulating its corporate umbrella.  *E.g.*, *Freeman*, 322 F.3d at 1146 ("Were we to grant immunity . . . merely because defendants nominally sell services through another entity rather than to consumers directly, we would risk opening a major loophole for resale price maintenance and retailer collusion."); *Royal Printing*, 621 F.3d at 327 (noting that it would be "intolerable" to "close off every avenue for private enforcement of the antitrust laws" by prohibiting indirect purchasers from suing price fixers who sell goods to their conspirators' subsidiaries).

Before concluding, the court observes that the parties do not agree about the date on which Costco sued.  They agree that Costco filed the complaint in this case in November 2010.  Costco, however, argues that it is entitled, as former member of the class of direct purchasers who first sued Defendants in late 2006, to claim that date as the date on which it sued.  The court's disposition today makes it unnecessary to resolve this dispute.  It notes, however, that one of pitfalls of Defendants' date-of-suit rule is that it would encourage defendants in a far-reaching conspiracy like this one to race to manipulate their corporate web to their advantage while the victims of the conspiracy plot

ORDER – 12

1   their lawsuits.[4]  The court doubts that any principled application of the law would deny

2   Costco some portion of its damages merely because it did not sooner depart from the

3   direct purchaser class.

4                                    **IV.  CONCLUSION**

5           For the reasons previously stated, the court DENIES Defendants' summary

6   judgment motion.  Dkt. # 484.

7           DATED this 11th day of September, 2014.

8

9

10

11                                          The Honorable Richard A. Jones
                                            United States District Court Judge

12

13

14

15

16

17

18

19

20

21

22

23

24   ---
     [4] Defendants' date-of-suit rule is perhaps commendable in its simplicity, but that simplicity
25   disguises more pitfalls than the ones the court has identified so far.  If all that matters is the
     possibility of suit by an uncontrolled (or uncontrolling) direct purchaser, the date of suit is no
26   more relevant than any other day on which a direct purchaser could sue.  The logic underlying
     Defendants' date-of-suit rule dictates that whether control changes before a plaintiff sues or after,
27   a price-fixer can avoid liability to indirect purchasers so long as there is *any* period of time where
     a direct purchaser could have sued.  The date of suit is no more significant than any other day.
28   ORDER – 13