1

2
                                        THE HONORABLE RICHARD A. JONES

3

4

5

6                     UNITED STATES DISTRICT COURT

7                   WESTERN DISTRICT OF WASHINGTON

8                              AT SEATTLE

9  COSTCO WHOLESALE CORPORATION,          Case No. C13-1207 RAJ

10             Plaintiff,                  **DEFENDANTS' SUPPLEMENTAL BRIEF
                                           PURSUANT TO COURT ORDER DATED
11        vs.                              APRIL 3, 2015 (DKT. # 671)**

12  AU OPTRONICS CORPORATION, et al.,      **[CITED TRIAL EXHIBITS FILED
                                           CONCURRENTLY]**
13             Defendants.
                                           **NOTED ON MOTION CALENDAR: MAY
14                                         1, 2015**

15                                         **ORAL ARGUMENT REQUESTED**

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    THE COURT MUST DETERMINE WHETHER COSTCO WAS THE NEXT-MOST-DIRECT PURCHASER .................................................................................... 1

II.   THE COURT HAS CORRECTLY ARTICULATED THE NEXT-MOST-DIRECT PURCHASER RULE IN THESE CIRCUMSTANCES ................................... 4

III.  COSTCO FAILED TO PROVE THAT IT WAS THE NEXT-MOST-DIRECT PURCHASER OF THE FINISHED PRODUCTS IT ACQUIRED FROM THE SIX VENDORS ................................................................................................... 5

    A.    Costco Was on Notice of the Need to Prove at Trial That It Was the "Next-Most-Direct" Purchaser ................................................................ 5

    B.    The Trial Evidence Showed That ODMs Had a Significant Presence in the Chain Between LCD Panel Manufacturers and Costco ............................ 7

        1.    The Bench Trial Record Placed Costco Two Steps Away from the Conspiracy ........................................................................................ 7

        2.    The Jury Trial Record Supports the Conclusion That ODMs/OEMs Purchased LCD Panels Directly from Panel Manufacturers ..................... 10

    D.    Costco Failed to Present, and Affirmatively Objected to, Evidence of the Supply Chain from Conspirators to Costco's Vendors ............................ 12

    E.    Costco Cannot Be Relieved of Its Burden of Demonstrating the Supply Chain for Its Purchases ................................................................... 14

        1.    There Is No Exception for Damages Based on Products That Re-Entered the Alleged Conspirators' Control After an Independent Purchase. ....................................................................................... 14

        2.    Vertical Integration Does Not Exclude ODM/OEM Purchases of Panels in the First Instance. ...................................................... 15

        3.    There Is No Basis for Finding That the ODMs/OEMs Were "Affiliated" with the Conspiracy. ................................................... 16

        4.    The Conspirators' Market Share Does Not Relieve Costco of Its Burden to Show Standing. .......................................................... 16

        5.    Allegedly Inadequate Record-Keeping Cannot Relieve Costco of Its Burden to Show Standing. ...................................................... 17

        6.    Costco Should Not Be Permitted to Re-Open the Trial Record. .............. 18

IV.   COSTCO HAS NOT PROVED THAT IT IS ENTITLED TO ANY AWARD OF DAMAGES ................................................................................................ 19

V.    CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ala. Legislative Black Caucus v. Alabama,*
    --- U.S. ---, 135 S. Ct. 1257 (2015) ...................................................................18

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) .............................................................................4

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) .............................................................................................4

*City of Vernon v. S. Cal. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ....................................................................19, 20

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson,*
    523 F.3d 1116 (9th Cir. 2008) .............................................................................3

*Friends of Coral Bay v. Reliance Housing Found., Inc.,*
    Civil No. 2007-20, 2008 WL 467391 (D.V.I. Feb. 1, 2008) ..............................18

*Gest v. Bradbury,*
    443 F.3d 1177 (9th Cir. 2006) ..........................................................................6, 7

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
    392 U.S. 481 (1968) ...........................................................................................14

*Ill. Brick Co. v. Illinois,*
    431 U.S. 720 (1977) .........................................................................................2, 1

*In re ATM Fee Antitrust Litig. ("ATM Fee"),*
    686 F.3d 741 (9th Cir. 2012) .....................................................................2, 3, 17

*In re Lithium Ion Batteries Antitrust Litig.,*
    No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014)............3, 16

*In re Lithium Ion Batteries Antitrust Litig.,*
    No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ...................3

*In re Vitamin C Antitrust Litig.,*
    279 F.R.D. 90 (E.D.N.Y. 2012) ...........................................................................4

*Kansas v. Utilicorp United Inc.,*
    497 U.S. 199 (1990)...............................................................................4, 14, 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................6

# TABLE OF AUTHORITIES

**Page(s)**

*Rosales v. El Rancho Farms*,
    No. 1:09-cv-00707-AWI-JLT, 2012 WL 292977 (E.D. Cal. Jan. 31, 2012)...........................17

*Royal Printing v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) ...................................................................................2, 3, 14, 19

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ................................................................................19

**DEFENDANTS' SUPPLEMENTAL BRIEF**

Defendants submit this Supplemental Brief addressing the four issues listed in this Court's April 3, 2015 Order (Dkt. # 671) (the "Order"). The Court's questions all relate to whether Costco proved that it was the "next-most-direct" purchaser of finished products containing price-fixed panels, *i.e.*, that there were no prior purchasers of the panels other than by entities owned or controlled by conspirators. This question goes to the heart of whether Costco has standing under the Supreme Court's decision in *Illinois Brick.*

To avail itself of the limited ownership/control exception to *Illinois Brick* set forth in the Ninth Circuit's *Royal Printing* decision, Costco was required to prove by a preponderance of the evidence that the supply chain from the conspirators to Costco included only entities owned or controlled by the conspirators. To the extent any non-conspiring entity *not* owned or controlled by a conspirator purchased the price-fixed panels before Costco did, any such purchase breaks the chain and derails Costco's effort to establish antitrust standing.

As explained more fully below, the evidence before the Court unequivocally established, *because Costco stipulated to it*, that original design/equipment manufacturers ("ODMs" or "OEMs") were at times part of the supply chain between LCD panel manufacturers and finished product vendors that sold to Costco. Additional evidence proved that ODMs at times purchased LCD panels directly. Given Costco's admission about the role of ODMs and because *Royal Printing* and *ATM Fee* require it, Costco's standing depended on whether it could prove both that *it* was the "next-most-direct" purchaser of the price-fixed panel and that an ODM *was not*. Costco, however, chose to ignore, and on occasion affirmatively resisted, this burden. It did so with the full knowledge and understanding of the need to prove its standing by a preponderance of the evidence and to delineate the role of ODMs in accordance with the summary judgment order of the MDL Court. On this record, the Court cannot find that Costco met its burden.

**I.    THE COURT MUST DETERMINE WHETHER COSTCO WAS THE NEXT-MOST-DIRECT PURCHASER**

**ISSUE NO. 1: Is there any dispute that the court must determine whether Costco was the next-most-direct purchaser of the finished products it acquired from the six**

1   **vendors?  Is there any dispute that the jury did not make that determination?**

2          Defendants answer "no" to both questions.

3          There is no legitimate dispute that the Court must determine whether Costco was the

4   next-most-direct purchaser of the panels that are the basis for its damages claims.  As this Court

5   has recognized, in the Ninth Circuit "[s]tanding is a question of law for the district court to

6   decide." *In re ATM Fee Antitrust Litig. ("ATM Fee")*, 686 F.3d 741, 747 (9th Cir. 2012); Order

7   at 2.

8          It is undisputed that Costco purchased only LCD finished products and that it never

9   purchased any price-fixed LCD panels.  As an indirect purchaser of panels, Costco is barred as a

10  matter of antitrust law from any recovery unless it proved an exception to the direct purchaser

11  rule.  *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977).  Here, Costco has tried to come

12  within the ownership/control exception to *Illinois Brick*, which "confers standing on an indirect

13  purchaser who purchases goods from a direct purchaser under the control of a price fixer."  *See*

14  Dkt. # 558 at 3; *ATM Fee*, 686 F.3d at 749 ("indirect purchasers may sue when . . . a conspiring

15  seller owns or controls the direct purchaser").

16         The relationship between the direct purchaser and the conspirator is a key element of the

17  ownership/control analysis.  In first carving out this exception, in *Royal Printing v. Kimberly-*

18  *Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980), the Ninth Circuit illustrated its limitation: the

19  Ninth Circuit allowed the plaintiff to proceed against "a subsidiary or division of a co-

20  conspirator," *id.*, but granted summary judgment on claims based on purchases "made through

21  independent wholesalers," *id.* at 327-28.  Where an independent, intermediate entity purchases

22  the price-fixed good—effectively "breaking" the distribution chain between the conspiring seller

23  and the plaintiff—then the downstream plaintiff (such as Costco) lacks standing as a matter of

24  law.  If a non-conspirator, non-controlled entity purchases the priced-fixed good, that is the only

25  entity that properly has standing to bring suit.

26         To come within the ownership/control exception, then, the plaintiff must show both the

27  owned or controlled status of the direct purchaser and the existence of a direct distribution path

28  from the conspirators to the direct purchaser.  So, for example, "[a] plaintiff who" invokes the

1   control exception and "alleges domination of a board of directors . . . must prove it." *ATM Fee*,

2   686 F.3d at 757.   Requiring such proof enforces the rationale for the exception in the first

3   instance, *i.e.*, that a direct purchaser that is owned or controlled will likely not sue, but an

4   independent direct purchaser will.  *See Royal Printing*, 621 F.2d at 326 ("There is little reason

5   for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or

6   division of a co-conspirator.").   Where, as here, independent, intervening companies (that is, the

7   ODMs) purchased the allegedly price fixed good before the finished product was distributed to

8   vendors that sold to the plaintiff, courts have found the control exception inapplicable.  *In re*

9   *Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *1, 2 (N.D.

10  Cal. Jan. 21, 2014)[1]; *see also Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d

11  1116, 1122 (9th Cir. 2008) (where plaintiff hospital had contracted directly with defendant

12  pharmaceutical company but had purchased defendant's price-fixed products from a third party,

13  plaintiff lacked standing, even though it paid the third party a price in part set by the defendant).

14      Given this legal framework and the explicit Ninth Circuit requirement that the Court

15  decide standing, the jury could not properly have decided whether Costco was the next-most-

16  direct purchaser.  Nor was it ever asked to do so, even in an advisory capacity.  The Court gave

17  no instructions on the question of whether Costco's vendors were themselves direct purchasers.

18  To the contrary, the general instruction on injury and proximate cause allowed the jury to find

19  "injury" without regard to the *Illinois Brick* limitation at all.  Dkt. # 622 at 31. The verdict form

20  contained four specific questions regarding the participation of LCD panel manufacturers in the

21  panel conspiracy and the amount of damages.  *See* Dkt. # 628 at 1-2.  None of these questions

22

23  _____

24  [1] In a later amended complaint, these plaintiffs narrowed their claims to eliminate purchases
    where independent ODMs intervened in the chain, so the court denied a further motion to
    dismiss.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL

25  4955377 (N.D. Cal. Oct. 2, 2014).  The court specifically noted that it was deciding the issue in
    the procedural posture of a motion to dismiss, and the denial of that motion did not mean that

26  plaintiffs would ultimately prevail on the issue.  *See id.* at *25 ("The DPPs allege facts which, if
    true, would tend to exclude the possibility that their purchases flowed through independent,

27  direct-purchaser packers not owned or controlled by any conspirator. While it is an open
    question whether such facts would suffice at a later stage of the proceedings, they do suffice

28  merely to *plead* standing under *Royal Printing*.") (emphasis in original).

1    asked the jury to decide whether Costco's six vendors or any upstream entity had been the initial,

2    direct purchaser of the price-fixed panels.

3    **II.    THE COURT HAS CORRECTLY ARTICULATED THE NEXT-MOST-DIRECT PURCHASER RULE IN THESE CIRCUMSTANCES**

4          **ISSUE NO. 2:   Is the next-most-direct purchaser rule an accurate statement of law?**

5

6          Yes.  Defendants do not dispute the Court's formulation of a next-most-direct purchaser

7    rule in the present posture of this case. As the Order explains, the Court has already decided

8    certain standing issues, *see, e.g.*, Dkt. # 558, and the jury has returned a verdict with respect to

9    certain finished products that Costco purchased from six specified vendors.  The remaining

10   question now is whether Costco has presented evidence to establish that the price-fixed panels

11   followed a sufficiently direct path to come within the ownership and control exception.  As the

12   Court's order explains, a purchase by an upstream entity  "outside the conspiracy" would defeat

13   standing.  Order at 4.  In those circumstances, Defendants agree that Costco must prove that it

14   was the "next-most-direct purchaser," as that concept is explained in the Order.[2]

15

16

17

18   _____

19   [2]  As the Court's Order also acknowledges, Defendants do not concede that Costco, as a
     purchaser of finished products, has standing, based on a separate antitrust doctrine, to recover
20   based on overcharges on price-fixed panels contained in those products.  Order at 4; *see Assoc.
     Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983); *Am. Ad
21   Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury
     requires the plaintiff to have suffered its injury in the market where competition is being
22   restrained.").  Defendants further reserve the multiple arguments previously made in this case
     regarding the propriety and application of the *ATM Fee/Royal Printing* exception, including the
23   timing of the determination, the adequacy of the control relationship (*e.g.*, whether a "corporate
     sibling" relationship with a conspirator suffices under *ATM Fee* and whether a parent-subsidiary
24   relationship alone is sufficient to meet the requirements of the exception, *see In re Vitamin C
     Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012)), the direction in which the control
25   relationship must run, and the viability of the control exception after the Supreme Court's
     decision in *Kansas v. Utilicorp United Inc.*, 497 U.S. 199 (1990). Defendants also reserve the
26   right to challenge any finding that Costco has otherwise satisfied the control exception with
27   respect to the six vendors listed on the verdict form.  *E.g.*, Dkt. # 555 at 13-19.

28

1    **III.    COSTCO FAILED TO PROVE THAT IT WAS THE NEXT-MOST-DIRECT**
2    **PURCHASER OF THE FINISHED PRODUCTS IT ACQUIRED FROM THE SIX**
     **VENDORS**

3           **ISSUE NO. 3:   What evidence in the trial supports (or undermines, in the case of**
4    **Defendants' supplemental brief) the conclusion that Costco was the next-most-direct**
5    **purchaser of the finished products it acquired from the six vendors?**

6           Costco cannot show that it was the "next-most-direct purchaser" of the LCD panels
7    contained in the finished products acquired from its vendors because Costco put on no proof as
8    to how the LCD panels and products at issue traveled from the conspirators to Costco's vendors.
9    The parties stipulated that at times ODMs (a term that includes systems integrators, contract
10   assemblers, or OEMs) were part of the supply chain between conspirators and branded vendors,
11   including vendors that sold to Costco.  There was also undisputed evidence that ODMs at times
12   purchased LCD panels from Defendants and other panel manufacturers and incorporated them
13   into finished LCD products.  But Costco presented no evidence that would permit the Court to
14   identify or quantify the volume of panels that moved through a distribution chain "inside" the
15   conspiracy before being incorporated into finished products sold to Costco, as opposed to LCD
16   panels that were purchased and incorporated into finished products by independent ODMs.
17   Because the Court has no basis for determining whether and to what extent Costco based its
18   damages only on finished products containing LCD panels that stayed wholly within the
19   conspiracy, Costco failed to establish its standing to recover on any of its claims.

20          **A.     Costco Was on Notice of the Need to Prove at Trial That It Was the "Next-**
                     **Most-Direct" Purchaser**
21

22          Defendants have consistently argued that Costco did not have standing to recover for
23   purchases made from suppliers that were themselves not direct purchasers of price-fixed LCD
24   panels and have specifically and repeatedly contended that purchases by independent ODMs
25   undermined Costco's ability to prove standing.  Nearly three years before trial, Defendants
26   moved for summary judgment in the Track 1 cases, including Costco, on "all claims . . . where
27   an ODM or systems integrator was the actual direct purchaser" in the MDL Court.  Dkt. # 200 at
28   20:24-27.  The motion addressed plaintiffs' burden and their inability to meet it even at the

summary judgment stage:  "Plaintiffs' evidentiary failure is particularly stark for purchases from more extended distribution chains.  In many instances, even the purported 'direct purchasers' are not purchasers at all.  Original Design Manufacturers ('ODMS') are often the true direct purchasers, having bought the panels from the manufacturers, assembled them in to finished products, and sold them to the companies who ultimately sold them to Plaintiffs."  *Id*. at 12:1-5.

In opposing summary judgment, Costco argued that "the ODM's involvement was strictly limited to *assembling* the LCD Product for the Defendant and returning it to the Defendant for sale to Plaintiffs under the Defendant's own brand name."  Dkt. # 248 at 18:7-9 (emphasis in original).  In denying the motion, the MDL Court ruled:

> "To the extent defendants argue that plaintiffs lack standing for finished products purchased by or sold to a systems integrator, ODM or other third party before reaching the Direct Action purchasers, the Court finds that *a genuine issue of material fact exists as to whether these parties actually buy price-fixed panels directly from panel manufacturers or whether they are retained by direct purchaser companies merely to assemble finished products*."

Dkt. # 297 at 6 n.6 (emphasis added).

The MDL Court's denial of the defense motion clearly put Costco on notice of the need to prove its standing at trial, and particularly to establish the details of the role played by ODMs in the supply chain.  Standing is an "indispensable part of the plaintiff's case," and, if the facts are controverted, the standing allegations "must be supported adequately by the evidence adduced at trial."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citations omitted).  Costco was required to make this showing by a preponderance of the evidence.  *See Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006).

Defendants continued to raise the standing issue after remand to this Court.  Defendants argued in their trial brief that "Costco must show that the U.S. subsidiaries . . . directly purchased panels from the conspirators. . . . Under [the cited] cases, any extra level in the distribution chain further undercuts Costco's standing arguments."  Dkt. # 555 at 14 n.14.  Defendants framed the question whether Costco's vendors were direct purchasers again on the eve of trial, in the parties' Joint Statement Regarding Control Issue: "If Costco is unable to put on specific proof that the vendor it purchased from in turn directly purchased LCD panels from a conspiring seller, Costco

1    has no alternate or independent basis from which it may recover from that seller."   Dkt. # 570 at

2    8; *see also id.* at 17 (one "key . . . issue[] that the Court would need to resolve in the proposed

3    bench trial" was "[w]hether Costco can establish that the products purchased from each vendor

4    contained panels that the vendor purchased directly from a conspiring seller").

5        Once trial began, LG Display's counsel noted in his opening statement that LCD panel

6    manufacturers "also sell to system integrators who themselves assembled the products and sold

7    to finished product makers, who then make the products we all love, the TVs, the laptops,

8    telephones, et cetera."  Trial Tr. 370:4-8 (Sept. 24).   Before beginning their examination of

9    Costco's expert, Dr. Bernheim, in the bench trial, Defendants explained that some of the

10   questions would "go to the ownership and control issue" because "some of the transactions were

11   ODMs, original design manufacturers, which we think breaks the link on the ownership and

12   control on some of the transactions." *See* Trial Tr. 582:3-8 (Sept. 25).   After the close of

13   Costco's case, Defendants moved for judgment as a matter of law on the question whether

14   Costco's vendors were direct purchasers.  *See* Trial Tr. 3166-67 (Oct. 21) ("[E]vidence in the

15   record at trial is devoid of any evidence that the Costco vendors, the six entities who are in

16   question, the four on the verdict form, are actually direct purchasers.").

17       In short, there can be no doubt that the presence of ODMs in the distribution chain, the

18   question of whether or not those ODMs actually purchased panels, and the effect of those issues

19   on Costco's status as a direct purchaser has been controverted throughout this litigation.   The

20   burden was Costco's to demonstrate its standing.  As this Court stated in the Order, "Defendants

21   had no obligation to tell Costco what it needed to prove to meet that burden."  Dkt. # 671 at 5.

22       **B.    The Trial Evidence Showed That ODMs Had a Significant Presence in the
         Chain Between LCD Panel Manufacturers and Costco**

23

24       **1.    The Bench Trial Record Placed Costco Two Steps Away from the
                 Conspiracy**

25       Costco stipulated in the bench trial record that "[t]he TFT-LCD supply chain sometimes

26   includes original equipment manufacturers ('OEMs') between panel makers and

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF

1    branded vendors."  Dkt. # 599 ¶ 33.  The stipulation includes a graphic from one of Costco's

2    experts' reports of a supply chain depicting "OEMs" between "Panel Makers" and "Brands"

3    such as Samsung, Philips, and Sharp:



12   *Id.*  This chart on its face places retailers such as Costco two steps away from LCD panel

13   manufacturers, with OEMs squarely in-between.[3]

14          Costco further stipulated that, just a year after the conspiracy ended, in 2007,

15   DisplaySearch reported that the ODMs and OEMs for *notebook PCs* were Quanta, Compal,

16   Wistron, ASUS, Unwill, FIC, Arima, ECS, Clevo, Mitac, and LG Electronics, while the top

17   brands for these products were ten entirely separate companies (Dell, HP, Acer, Toshiba,

18   Lenovo, Fujitsu-Siemens, SONY, NEC, ASUS, Apple and Gateway).  *Id.* ¶ 34. DisplaySearch

19   also reported, as Costco again stipulated, that the ODMs and OEMs for *monitors* were AOC,

20   BenQ, Foxconn, Lite-On, Philips, Coretronics, Compal, Delta, Proview, Samsung, and LG

21   Electronics; in this instance, only three entities appear on both the ODM/OEM and "Brand" list

22   (Samsung, LG Electronics, and Philips).   *Id.* ¶ 35.   For *televisions*, the report listed the

23   ODM/OEMs as BenQ, TECO, Sampo, Tatung, Lite-On, AOC, Compal, Visionbank, Philips,

24   Coretronics, and Albatron.  The corresponding list of the top ten brands included all six of the

25

26

---

27   [3] Again, the terms "OEMs" and "ODMs" appear to be used interchangeably in the industry.  The
     other paragraphs to which Costco stipulated refer to "ODMs and OEMs," and the other chart lists

28   the various entities under the heading "ODM/OEM."  *See* Dkt. # 599 at ¶¶ 34-36.

1    vendors from whom Costco purchased (Sharp, Philips, Samsung, Panasonic, Toshiba, and JVC)

2    but none of these vendors appeared on the ODM/OEM list. *Id.* ¶ 36.

3           These charts at a minimum show that Costco's branded vendors at times obtained their

4    products from ODMs or OEMs with no connection to the conspiracy.  Having stipulated to these

5    facts, Costco's failure to present pertinent evidence is all the more significant.  Most of the listed

6    ODMs/OEMs were never mentioned at the trial, let alone proven to be owned or controlled by

7    members of the conspiracy.  Costco offered no evidence whatsoever to show where or how these

8    entities obtained the panels used in the finished products, or whether they were operating in the

9    distribution chain in some capacity that does not undermine its standing.[4]

10          During the bench portion of the trial, Costco's own expert Dr. Bernheim agreed that

11   "third-party ODMs" were part of Toshiba's notebook supply chain.  Trial Tr. 686:1-687:7 (Sept.

12   25); *see also* Trial Ex. 5503-116 (Ex. 1) (same).[5]  After reviewing data provided by Philips, Dr.

13   Bernheim reported that portable DVDs "were built with the Philips insignia by contract

14   manufacturers" and "the cost represents what Philips paid for the product, including freight and

15   shipping."  Trial Ex. 5503-116 (Ex. 1); *see also* Trial Tr. 686:1-687:7 (Sept. 25).  The only

16   reasonable inference from Dr. Bernheim's finding is that Philips "paid" its contract

17   manufacturers for the finished "product," including the LCD panels contained in them, and that

18   the contract manufacturers had previously and directly purchased those panels from the panel

19   manufacturers.

20          Costco's counsel did not elicit any rebuttal testimony from Dr. Bernheim or otherwise

21   introduce any evidence that would build upon, contradict or limit the above evidence. *See* Trial

22   Tr. 687:11 (Sept. 25) (Mr. Burman: "My contribution is no questions.").  Costco offered no

---

[4] To the extent there is some limited overlap between ODMs/OEMs in some categories (*e.g.*, Philips is listed as both an ODM/OEM and a branded vendor of televisions), that overlap does not save even that portion of Costco's claims, as Costco never provided a breakdown of the product mix (*e.g.*, the extent of damages based on Philips' televisions) for its damages claims based on purchases from any particular vendor.

[5] All references to "(Ex.)" are exhibits filed concurrently herewith, unless otherwise noted.

1   evidence to support a finding that the products purchased by Costco traveled directly down the

2   supply chain from one conspirator to another and ultimately to Costco's vendors.

3       On this record, the evidence in the bench trial is uncontradicted and requires a finding

4   that Costco did not prove its standing as the "next-most-direct purchaser."

5

6           2.      **The Jury Trial Record Supports the Conclusion That ODMs/OEMs**
                    **Purchased LCD Panels Directly from Panel Manufacturers**

7       To the extent the Court considers additional evidence from the jury trial record on this

8   issue, that evidence does not help Costco.  If anything, that evidence further supports the

9   conclusion that ODMs and OEMs were part of the LCD panel supply chain, and that, on at least

10  some occasions, they purchased panels directly from the panel manufacturers.

11      Defense expert Dean Snyder defined an original equipment manufacturer as "[s]omebody

12  who is making a new product, like a television . . . *[who] might actually buy a panel from one of*

13  *the manufacturers, and then make a product*, and then sell it to a retailer or somebody else."

14  Trial Tr. 2602:7-15 (Oct. 16) (emphasis added); *see also* Trial Tr. 685:14-17 (Sept. 25) (Dr.

15  Bernheim's testimony) (an original design manufacturer, or ODM, is "a company that designs

16  and manufactures a product as specified and is eventually rebranded").  Rather than proving the

17  lack of involvement or absence of purchases by ODMs, Costco itself introduced numerous

18  exhibits showing that ODMs and OEMs were direct purchasers of LCD panels:

19
            •       A 1998 CPT "customer contact report" with Mitsubishi distinguished between
20
                    "orders from customers with own brand" and "large OEM customers," with the
21
                    latter "not considered at this time."  Trial Ex. 11  at 1 (Ex. 2).
22
            •       The December 7, 2001, Crystal Meeting minutes stated that "LCD Monitor
23
                    demand keep strong, customers including OEM and PC buyers request to <u>secure</u>
24
                    <u>more panel allocation by paying more</u>."  Trial Ex. 183 at 6 (emphasis in original)
25
                    (Ex. 3).
26

27

28

- The March 8, 2002, Crystal Meeting minutes discussed whether OEMs could absorb price increases and how "Taiwanese laptop OEMs are diligently stocking up on Panel, such as Compal and Clevo."  Trial Ex. 221 at 1 (Ex. 4).

- The June 5, 2002, Crystal Meeting minutes stated that "on the customer end, including at PC branded and OEM integrator, the [LCD panel] inventory high."  Trial Ex. 257 at 1 (Ex. 5).

- A 2002 internal CMO email reported Samsung's prices for "OEM customer" and "general customer," with the OEM's price as the higher of the two.  Trial Ex. 276 at 1 (Ex. 6).

- In the July 4, 2002, Crystal Meeting minutes, CPT's president stated, "Absolutely do not consent to any disguised forms of price lowering requests from OEM customers."  Trial Ex. 279 at 2 (Ex. 7).

- A 2004 internal Samsung email on TFT-LCD market conditions stated that "the ODMs are not willing to take any required volume more than the optimal volume" and that the ODMs "are trying to minimize risks by price reductions," and notes that "OEMs and ODMs . . . are expected to pressure the LCD vendors in the form of price reductions and requesting for price protection."  Trial Ex. 836 at 1, 8 (Ex. 8).

- Another 2004 internal Samsung email noted, under the heading of "Customer trends," that "such customers" as "ODM/OEM" are "putting in a lot of effort to be compensated" for a "drop in inventory values," named "Quanta, Asustek and Compal" as some notebook ODMs, and stated that "the OEMs are requesting for the lowest price" and that "LCD vendors . . . [are] mak[ing] sure that the ODMs are comfortable with taking their panels."  Trial Ex. 890 at 1-2 (Ex. 9).

- A 2004 internal LG Display email reporting on a meeting with Toshiba stated that CPT "advanced into 15.4w toward ODM" and that "inventory adjustment is being performed due to slow sales and ODM buy & sell change."  Trial Ex. 900 at 2 (Ex. 10).

DEFENDANTS' SUPPLEMENTAL BRIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- The September 6, 2005, Crystal Meeting report from AUO stated that "Slow demand growth for both End-user and OEM side" in the monitor market.  Trial Ex. 1179 at 40 (Ex. 11).

Testimony from Defendant and other panel manufacturer witnesses further established that ODMs frequently acted as LCD panel customers.  AUO's James C.P. Chen testified that AUO "mostly s[old] to the OEMs and the ODM customers" and that "[i]t's possible that they then ship or sell to the U.S. or the U.S. market."  Trial Tr. 1478:16-17 (Oct. 6).  According to Mr. Chen, AUO "would go to . . . OEM and ODM manufacturers to verify the range of the quote from LPL or Samsung," implying that the OEMs and ODMs were receiving price quotes directly from these other companies.  *Id.* at 1494:15-16 (Oct. 6).  CPT's C.C. Liu testified that the "benchmark" customers for CPT were "integration customers" such as Kuan Chieh, or "TPD [sic, TPV]," and "brand" customers like HP and Dell.  Trial Tr. 1117:7-14 (Oct. 1).  Toshiba's Michael Blashe specifically distinguished between "direct customers," which he defined as "an OEM or contract manufacturer," and distributor transactions.  Trial Tr. 2706:3-10, 2708:17-22 (Oct. 16).

The above evidence showed that ODMs and OEMs were an independent part of the LCD panel supply chains, including the supply chains of companies from whom Costco purchased, and that ODMs *were themselves direct purchasers of LCD panels*, thereby breaking any chain of direct distribution from conspiring panel manufacturers to Costco.

**D.   Costco Failed to Present, and Affirmatively Objected to, Evidence of the Supply Chain from Conspirators to Costco's Vendors**

The above evidence must be weighed against evidence, if any, supporting the conclusion that Costco was indeed the next-most-direct purchaser of the panels in the finished products that it acquired from its six vendors.  Order at 7.  Mere evidence that the panel manufacturers sometimes bought panels from each other does not satisfy Costco's burden.  *See, e.g.*, Trial Tr. 2740:17-2741:9, 2745:12-15 (Oct. 15) (Toshiba purchased the majority of its panels for notebook PCs from LG Display and Samsung); *id.* at 2752:24-2753:4 (Sharp on occasion purchased television panels or modules from manufacturers such as AUO or CMO).  Even if

Costco manages to find evidence that the branded vendors sometimes purchased the panels in order to provide them to ODMs or OEMs for assembly, such evidence would not negate the evidence that, at other times, the ODMs were the direct panel customers who then re-sold the panels to the branded vendors as part of an integrated product.  It was Costco's burden to prove that the LCD panels in the finished products it purchased remained within the circle of conspirators or their corporate families at each level of the supply chain until reaching Costco's vendors.  Absent such proof, the Court has no basis for concluding that Costco was the "next-most-direct" purchaser.  Further, the record provides no basis for quantifying when and to what extent the independent ODMs purchased the panels themselves.

Costco's failure to quantify the role of ODMs in the supply chain is even less understandable given that some evidence on the issue was developed in this case before trial.  *See, e.g.*, Dkt. # 248 (Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment Under *Illinois Brick* and *ATM Fee*); Dkt. # 486   (Defendants' Motion for Partial Summary Judgment Based On Foreign Sales).[6]  But rather than introduce any evidence to show standing for at least some of its purchases, Costco turned down every opportunity to demonstrate the requisite details of purchases along the supply chain from conspirators to Costco's vendors:

- In the parties' Joint Statement Regarding the Control Issue, Costco addressed the notion that it needed to prove its vendors were direct purchasers with the assertion that "Defendants feign a dispute where none can possibly exist."  Dkt. # 570 at 9.

- When Defendants sought to question Costco's expert Dr. Bernheim about the presence of ODMs in the supply chain, Costco's counsel "object[ed] to this whole area of ODMs being an area of inquiry of any relevance in the trial."  Trial Tr. 682:23-25 (Sept 25).

- As noted above, Costco's counsel declined to elicit any testimony from Dr. Bernheim during the bench trial regarding the role of ODMs.  *Id.* at 687:11.

---

[6] Evidence quantifying the role of ODMs in the finished products purchased by other plaintiffs was also developed in the "Track 2" LCD cases, to which Costco was not a party.

- Costco also objected when Defendants sought to question their own expert, Dean Snyder, about the supply chain, arguing that this was "an attempt to suggest to the jury that the way in which these panels got into finished products and got to Costco is so complicated that the jury should do some deduction from the six vendors that we have identified." Trial Tr. 2548:2-5 (Oct. 15).

- When the Court gave Costco the chance "to make any additional record" after Defendants moved for judgment as a matter of law on the direct purchaser and other issues, Costco declined.  Trial Tr. 3176:17-3177:6 (Oct. 21).

**E.**     **Costco Cannot Be Relieved of Its Burden of Demonstrating the Supply Chain for Its Purchases**

Given the absence of adequate evidence about the supply chain for the LCD panels in the finished products it purchased, Costco should not be permitted to avoid the consequences of its failure to make a record by arguing now that it was not required to present evidence, that the Court should infer the necessary facts to conclude that Costco suffered a cognizable antitrust injury, or that Costco should be allowed to re-open or otherwise supplement the record.

**1.**     **There Is No Exception for Damages Based on Products That Re-Entered the Alleged Conspirators' Control After an Independent Purchase.**

Costco's studious avoidance of the ODM issue at trial suggests that it intends to argue that its purchases of finished products from owned or controlled entities are sufficient to establish standing, even if independent third-party ODMs purchased the price-fixed panels in the first instance.  Costco's theory is that the finished products "re-entered" the conspiracy through sales to companies owned or controlled by conspirators.  This novel theory, not advanced at the summary judgment stage, flies directly in the face of *Illinois Brick*'s rule limiting standing to a single direct purchaser, as it would mean that at least two entities (the ODM and Costco) had standing to sue based on the same panels.  No case supports a "re-entry" theory of antitrust standing, which contravenes the Supreme Court's admonition not to carve out additional exceptions to the direct purchaser rule.  *See Kansas v. Utilicorp United Inc.*, 497 U.S. 199, 216 (1990).   Indeed, this theory would virtually ensure that defendants would face the "twin

1    rationales of danger of multiple liability and complexity of proof" that *Illinois Brick* was meant

2    to prevent. *Royal Printing*, 621 F.2d at 326. Given the prohibition against a downstream pass-

3    on defense in suits brought by the direct purchaser, ODMs that paid overcharges on LCD panels

4    have the same incentive to sue that Costco has and, with respect to their panel purchases, are the

5    only entities with standing to recover. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392

6    U.S. 481, 493 (1968). This Court should decline any invitation to fabricate a new exception to

7    *Illinois Brick*.

8                    **2.      Vertical Integration Does Not Exclude ODM/OEM Purchases of**
                              **Panels in the First Instance.**
9

10            Costco cannot save its claims merely by pointing out that some of its vendors, *e.g.*, Sharp

11   Samsung, and Toshiba, were vertically integrated, *i.e.*, wholly owned by conspiring parent

12   companies that manufactured LCD panels. Vertical integration does not mean that the parent

13   supplied all or even most of the LCD panels used in its finished products. In fact, the record

14   established that Sharp, Samsung and Toshiba all purchased panels from *outside* their corporate

15   families. *See, e.g.*, Trial Tr. 969:17-19 (Sept. 30) (Sharp "purchase[d] LCD panels from some of

16   its competitors in Taiwan"); Trial Ex. 5011 § 8.2 (Ex. 12) ("Samsung was the largest monitor

17   module *customer* in Q2 '02 with a 14% market share" (emphasis added)); Dkt. # 599-7 at 6:23-

18   7:8 (testimony by Toshiba witness that "we had to purchase all our TV panels from some other

19   source"). The evidence was also undisputed that these vertically integrated companies included

20   ODMs in their supply chains. *See* Dkt. # 599 ¶ 33 (stipulated chart placing Samsung and Sharp

21   downstream from the ODMs). The conclusion that these companies relied on ODMs at least part

22   of the time was supported by testimony that (i) Sharp used both its own subsidiaries *and contract*

23   *manufacturers* in Asia and China to make televisions, *see* Dkt. # 599-9 at 4:6-15, 5:24-23; (ii)

24   Dr. Bernheim's testimony that Toshiba outsourced its notebook production to "third-party

25   ODMs," Trial Tr. 686:1-687:7 (Sept. 25); and (iii) the multiple trial exhibits reflecting

26   Samsung's use of ODMs, *see, e.g.*, Trial Ex. 836 at 1, 8 (Ex. 8); Trial Ex. 890 at 2 (Ex. 9).

27            The undisputed evidence that vertically integrated companies went outside their corporate

28   families for both LCD panels and for the manufacture of finished products required Costco to go

---

1  beyond a showing of mere vertical integration and to prove which entity (conspiring parent or

2  ODM or subsidiary vendor) first purchased the panels that ended up in the finished products

3  Costco purchased.  It did not do so.

### 3. There Is No Basis for Finding That the ODMs/OEMs Were "Affiliated" with the Conspiracy.

In arguing against any further briefing on the ODM/direct purchaser issue, Costco
suggested that "the number of involved affiliates," apparently referring to ODMs, would not
affect a "reasonable inference of control between panel manufacturer and affiliated product
vendor."  Dkt. # 643 at 2.  In fact, there is zero evidence in the record to support a finding of an
undefined "affiliate" relationship between the multiple ODMs/OEMs that Costco stipulated were
involved in the supply chain and the panel manufacturers.  Apart from the stipulation, the names
of most of the ODMs and OEMs do not even appear anywhere else in the record.

The MDL Court has already rejected the notion that a contractual relationship between a
conspirator and a third party ODM or OEM is akin to an owned/controlled relationship.  *See* Dkt.
# 299 at 8 (granting Defendants' motion for summary judgment with respect to Costco's Vizio
purchases based on theory that this company was "affiliated with conspirators": "The standard
required to demonstrate an ownership/control relationship does not encompass this expanded
relationship").   To the extent Costco argues that "affiliate" or other relationships short of
ownership/control can suffice for purposes of standing, the Supreme Court's prohibition against
new exceptions to *Illinois Brick* precludes any such analysis.  *Utilicorp*, 497 U.S. at 216; *see In
re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *8 ("mere influence by itself is not
enough to establish control within the meaning of the exception").

### 4. The Conspirators' Market Share Does Not Relieve Costco of Its Burden to Show Standing.

Costco cannot rely on the conspirators' large share of the panel market to support an
inference that Costco must have suffered an antitrust injury under the Sherman Act.  *See* Trial Tr.
3428:21-3429:2 (Oct. 22) (Costco counsel argued in closing that the distribution chain was "not
really that complicated in terms of what you need to decide" because "90 percent of the panels in
the products that Costco bought from those six vendors came from conspirators"); *see id.* at

-16-
DEFENDANTS' SUPPLEMENTAL BRIEF

3429:4-20 (arguing "that if Costco bought in some other way or if Costco was itself a manufacturer, it would have to deal with distributors or third party OEMs or whatever" but that the issue here was "if you are selling panels to a finished product company that is going to sell to Costco, you need to obey the law").

Costco's references to market share beg the question here.  Market share may help in a determination of what percentage of Costco's purchases likely contained panels that originated with a conspiring panel manufacturer.  But market share sheds no light on which entities purchased and owned those panels before they reached Costco's vendors, which is the critical question for standing purposes.  *See* Order at 4.  Indeed, the fact that Costco bought products containing panels that likely originated with a conspirator established only that Costco was an *indirect* purchaser whose claims are barred by *Illinois Brick*.  To have antitrust standing, Costco was required to prove more.

### 5.   Allegedly Inadequate Record-Keeping Cannot Relieve Costco of Its Burden to Show Standing.

Costco cannot avoid its obligation to prove its own standing because of an alleged failure by Defendants or other panel manufacturers to create adequate records.  It is Costco's burden to prove standing; nothing about the manufacturers' record-keeping changes that requirement.  *See ATM Fee*, 686 F.3d at 747; *see also Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI-JLT, 2012 WL 292977, at *9 (E.D. Cal. Jan. 31, 2012) ("'Regardless of any failure by Defendant to maintain records for various farm laborers, Plaintiffs bear the burden of proof on the issue of standing.'") (citation omitted).  In any event, standing cannot be assumed as a result of Costco's failure to pursue any evidence on this issue.  While the defendants in the MDL litigation produced records of their own panel sales, including sales to many ODMs, the LCD panel manufacturers cannot be expected to have any record of sales of finished products by those independent ODMs.  To get that information, Costco could have pursued discovery from the ODMs (as other litigants in the MDL have done).  Costco elected not to do so.

1    **6.    Costco Should Not Be Permitted to Re-Open the Trial Record.**

2    Costco expressly declined the opportunity to supplement the record when Defendants

3    challenged its proof on the direct purchaser issue at the close of the evidence.   Trial Tr. 3176:17-

4    3177:6 (Oct. 21).   Any request to do so at this stage should be denied.

5    Where, as here, a party's attempt to reopen would simply be an attempt "to have two

6    bites of the apple when they are entitled to only one," the Court should decline to exercise its

7    discretion to reopen the record.   *Friends of Coral Bay v. Reliance Housing Found., Inc.*, Civil

8    No. 2007-20, 2008 WL 467391, at *4 (D.V.I. Feb. 1, 2008).   In *Friends of Coral Bay*, a week

9    after both parties rested, the plaintiff filed a motion to reopen the record with testimony intended

10   to support its standing.   *Id.* at *3.   The court denied the motion, because although the failure to

11   introduce such evidence was at trial was "fatal to [the plaintiffs'] claims," the evidence had been

12   available at the time of trial, was not newly discovered, and the plaintiff could not present a valid

13   reason why it did not present the testimony in a timely manner.   *Id.* at *2, *3-*4.

14   The circumstances here weigh even more strongly against reopening the record.   The

15   fundamental question of antitrust standing has been at the core of the parties' pre-trial and trial

16   disputes, and Costco has been on notice of its burden with respect to the direct purchaser issue

17   for years.   Costco has no claim that its failure to present evidence at trial was because of

18   Defendants' subterfuge or negligence.   *Cf. Ala. Legislative Black Caucus v. Alabama*, --- U.S. ---

19   , 135 S. Ct. 1257, 1269 (2015) (ordering district court to supplement the record because the

20   "common sense inference" from plaintiffs' showing of standing at trial was "strong enough . . .

21   to believe that, in the absence of a state challenge or a court request for more detailed

22   information" it need not present more evidence).   Here, Costco could not have presumed that

23   Defendants "did not contest" its showing with respect to standing.   *Id.*   Rather, Costco's choice

24   not to present evidence relating to the supply chain and the presence of ODMs was a strategic

25   decision to try to prevent any and all evidence potentially related to inferences of upstream pass-

26   on through the long supply chain of LCD panels.

27   Finally, any request by Costco to reopen the evidentiary record would come far too late

28   and would unduly burden both the Court and Defendants.   If the record is re-opened, Defendants

1    would be entitled to put in additional evidence regarding the role of ODMs and, depending on

2    Costco's showing, re-call their own experts and perhaps other witnesses to address the ODM

3    issue. The extent to which Costco's experts could even opine on the ODM issue would itself be

4    a subject of additional litigation, because Dr. Bernheim disclosed only the limited opinions on

5    this topic (that Toshiba and Philips used ODMs) discussed above. Costco had nearly five weeks

6    to make its case; it should not be given another opportunity.

7    **IV.   COSTCO HAS NOT PROVED THAT IT IS ENTITLED TO ANY AWARD OF
         DAMAGES**

8
     **ISSUE NO. 4:   What adjustments to the damage figures in the jury's verdict are**
9
     **appropriate because of the application of the next-most-direct purchaser rule?**
10
11         Because Costco gave this Court no means for determining what, if any, portion of its

12   claimed damages were based on purchases that traveled directly from a conspirator to Costco's

13   vendors, it is not entitled to any award of damages at all.

14         As noted above, the *Royal Printing* court distinguished between permissible recovery,

15   based on purchases from wholly owned subsidiaries, and impermissible damages claims, based

16   on purchases from independent wholesalers. *Royal Printing*, 621 F.2d at 327-28; *see also Sun*

17   *Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1178-82 (N.D. Cal. 2009)

18   (dismissing plaintiffs' Clayton Act claim under the ownership-or-control exception regarding

19   purchases of products from ODMs but not dismissing claims regarding purchases of products

20   from defendants or their affiliates). But here, Costco failed entirely to establish the requisite

21   details of purchases along the supply chain for any of the six vendors from which it purchased

22   finished products. Nor did Costco present expert testimony estimating the percentage of panels

23   purchased by ODMs, as opposed to the number of panels that passed directly from conspiring

24   panel manufacturers to branded vendors.

25         In *City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1372-73 (9th Cir.

26   1992), the plaintiff City of Vernon sought damages from defendant Southern California Edison

27   on the theory that Edison had engaged in various types of anticompetitive conduct. Affirming

28   summary judgment for the defendant, the Ninth Circuit concluded that Vernon's damages

1   evidence "failed to segregate the losses, if any, caused by acts which were not antitrust violations

2   from those that were." *Id.* at 1372.  Because there was "no indication of what part of [Vernon's

3   alleged] loss of savings was due to proper interruptions of service and what part to improper

4   ones, or for that matter, due to other factors entirely," the damages evidence was "plainly

5   insufficient." *Id.* at 1372-73.  Though Vernon "insist[ed] that all of Edison's acts contributed to

6   the damage figure," the court "agree[d] with the district court" that Vernon's damages study left

7   a trier of fact in the position of "having no proper proof of damages at all," and affirmed

8   summary judgment against Vernon. *Id.* at 1373.

9        Here, too, the absence of any evidentiary basis or methodology for distinguishing

10  between damages properly claimed by Costco as a next-most-direct purchaser and damages

11  improperly claimed because of panel purchases outside the conspiracy requires that Costco

12  recover nothing.   Any other result would necessarily and improperly require the Court to

13  speculate as to the amount by which the jury's award should be reduced. *See* Dkt. # 622 at 32

14  (damages must be based on "reasonable basis in the evidence" and cannot be "purely

15  speculative").

16  **V.       CONCLUSION**

17        For the foregoing reasons, Defendants respectfully request the Court to find that Costco

18  failed to prove its standing as the next-most-direct purchaser with respect to any of the purchases

19  on which the damages award was based and to enter judgment in Defendants' favor.

20  Alternatively, Defendants request the right to respond to any claim by Costco that a portion of

21  the jury award should remain.

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF

DATED: April 20, 2015  By: /s/ Brad D. Brian
            Brad D. Brian (*pro hac vice*)
            Jerome C. Roth (*pro hac vice*0
            Susan E. Nash (*pro hac vice*)
            Kyle W. Mach (*pro hac vice*)
            Christopher M. Lynch (*pro hac vice*)
            Andrew G. Prout (*pro hac vice*)
            MUNGER, TOLLES & OLSON LLP
            355 South Grand Avenue
            Los Angeles, CA 90071-1560
            Telephone: (213) 683-9100
            Facsimile: (213) 687-3702
            E-mail: brad.brian@mto.com
             jerome.roth@mto.com
             susan.nash@mto.com
             kyle.mach@mto.com
             christopher.lynch@mto.com
             andrew.prout@mto.com

            By: /s/ Rudy A. Englund
            Rudy A. Englund, WSBA # 04123
            LANE POWELL PC
            1420 Fifth Avenue, Suite 4200
            P.O. Box 91302
            Seattle, WA 98111-9402
            Telephone: (206) 223-7000
            Facsimile: (206) 223-7107
            E-mail: EnglundR@LanePowell.com

            *Attorneys for Defendants LG Display Co., Ltd.,*
            *and LG Display America, Inc.*

1    DATED: April 20, 2015            By: /s/ David C. Lundsgaard
                                      David C. Lundsgaard, WSBA #25448
2                                     GRAHAM & DUNN PC
                                      Pier 70, 2801 Alaskan Way, Suite 300
3                                     Seattle, WA 98121-1143
                                      Telephone: (206) 340-9691
4                                     Facsimile: (206) 340-9599
                                      Email: dlundsgaard@grahamdunn.com
5
                                      By: /s/ Carl L. Blumenstein
6                                     Christopher A. Nedeau (*pro hac vice*)
                                      Carl L. Blumenstein (*pro hac vice*)
7                                     Farschad Farzan (*pro hac vice*)
                                      NOSSAMAN LLP
8                                     50 California Street, 34th Floor
                                      San Francisco, CA 94111
9                                     Telephone: (415) 398-3600
                                      Facsimile: (415) 398-2438
10                                    Email: cnedeau@nossaman.com
                                       cblumenstein@nossaman.com
11                                     ffarzan@nossaman.com

12                                    Joseph P. Russoniello (*pro hac vice*)
                                      BROWNE GEORGE ROSS LLP
13                                    121 Spear Street, Suite 200
                                      San Francisco, California 94105
14                                    Telephone: (415) 391-7100
                                      Facsimile: (415) 391-7198
15                                    Email: JRussoniello@bgrfirm.com

16                                    *Attorneys for Defendants AU Optronics*
                                      *Corporation and AU Optronics Corporation*
17                                    *America*

18

19

20

21

22

23

24

25

26

27

28

-22-

DEFENDANTS' SUPPLEMENTAL BRIEF

1

**CERTIFICATE OF SERVICE**

2      I certify that on April 20, 2015, I electronically filed the foregoing **DEFENDANTS'**

3 **SUPPLEMENTAL BRIEF PURSUANT TO COURT ORDER DATED APRIL 3, 2015**

4 **(DKT. # 671)** with the Clerk of the Court using CM/ECF system, which will send notification of

5 such filing to all attorneys of record.

6      I certify under penalty of perjury that the foregoing is true and correct.

7      DATED this 20th day of April, 2015, at Los Angeles, California.

8

9

10                                        */s/ Susan E. Nash*

11                                   Susan E. Nash (*pro hac vice*)
                                     MUNGER, TOLLES & OLSON LLP
                                     355 South Grand Avenue
12                                   Los Angeles, CA 90071-1560
                                     Telephone: (213) 683-9100
13                                   Facsimile: (213) 687-3702
                                     Email: susan.nash@mto.com
14                                   *Attorneys for Defendants LG Display Co., Ltd.,*
                                     *and LG Display America, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF