THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COSTCO WHOLESALE
CORPORATION,

               Plaintiff,

    v.

AU OPTRONICS CORPORATION et al.,

          Defendants.

No. 13-cv-1207-RAJ

**COSTCO'S OPPOSITION TO DEFENDANTS' COMBINED MOTIONS FOR [1] JUDGMENT AS A MATTER OF LAW (FRCP 50); [2] IN THE ALTERNATIVE, FOR A NEW TRIAL (FRCP 59); AND [3] AMENDMENT OF FINDINGS IN BENCH TRIAL (FRCP 52(b))**

**[CITED MDL ORDERS AND EXCERPTS OF TRIAL EXHIBITS FILED CONCURRENTLY]**

**Noted on Motion Calendar: August 21, 2015**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... III

II. STANDARD OF REVIEW ................................................................................ 1

    A. Judgment as a Matter of Law .................................................................. 1

    B. Motion for New Trial ............................................................................... 1

III. THE EVIDENCE SUPPORTS THE ADMITTED FACT AND JURY FINDING THAT THE CONSPIRACY INJURED COSTCO ........................................................ 2

    A. Defendants' Admission That Costco Was Injured Estops Them From Challenging Injury-In-Fact ..................................................................... 2

    B. The Jury Reasonably Found That Costco Paid Overcharges ................... 4

        1. Costco Had A Lenient Burden for Establishing Its Injury ........... 4

        2. The Evidence Supports the Jury's Finding That Costco Purchased Finished Products Containing Price-Fixed Panels ....................... 6

        3. The Evidence Supports the Jury's Finding that Defendants' Panel Price-Fixing Raised The Prices Paid By Costco ......................... 8

IV. COSTCO ESTABLISHED ANTITRUST STANDING ........................................ 11

V. THE EVIDENCE SUPPORTS THE JURY'S FINDING THAT COSTCO'S FEDERAL CLAIM WAS PERMITTED UNDER THE FTAIA .................................. 14

    A. The Import-Commerce Exclusion Was Satisfied By Evidence of Transactions Between a Member of the Conspiracy and a Customer in the United States ........................................................................................ 14

    B. The Domestic-Effects Exception Was Satisfied By Evidence of the Conspiracy's Impact on Prices Paid by Finished-Product Purchasers in the United States ........................................................................................ 15

VI. COSTCO'S BURDEN MUST BE EVALUATED THROUGH THE LENS OF THE OWNERSHIP/CONTROL RULE ............................................................. 18

VII. COSTCO CAN RECOVER FOR ITS PURCHASES FROM PHILIPS AND PANASONIC .............................................................................................. 20

    A. The Evidence Supports the Jury's Finding that Philips Was a Conspirator ........ 20

    B. The Evidence Supports the Jury's Finding that Panasonic Was a Conspirator ............................................................................................ 23

    C. Philips and Panasonic Were in Ownership/Control Relationships with Conspirators ........................................................................................... 26

VIII. THE COURT CORRECTLY DETERMINED THAT COSTCO HAS STANDING ..... 27

    A. Defendants Face a High Burden in Seeking Amendment ..................... 27

    B. The Court Correctly Interpreted and Applied the "Control" Exception ........... 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**TABLE OF CONTENTS**
**(Continued)**

C.    The Court Correctly Found That JVC Was Owned/Controlled by Conspirator Panasonic ........................................................................................ 29

IX.    CONCLUSION ........................................................................................................ 30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF AUTHORITIES

**CASES**

*Assoc. Gen. Contractors of Cal. v. Cal.State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................11, 12, 14, 19

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013) ...................................................................13

*Diocese of Winona v. Interstate Fire & Cas. Co.*,
    89 F.3d 1386 (8th Cir. 1996) .............................................................................27, 28

*E.E.O.C. v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) ..................................................................................12

*Evans, Inc. v. Tiffany & Co.*,
    416 F.Supp. 224 (N.D. Ill. 1976) ............................................................................27

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ...........................................................................................14, 15

*Helfand v. Gerson*,
    105 F.3d 530 (9th Cir. 1997) ....................................................................................2

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .......................................................................................... passim

*In re ATM Fee Antitrust Litig.*,
    686 F.3d 741 (9th Cir. 2012) ......................................................................19, 29, 30

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1143 (N.D. Cal. 2009) ...................................................................13

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) .............................................................................11

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ...............................................................................28

*Knutson v. Daily Review, Inc.*,
    548 F.2d 795 (9th Cir. 1976) ................................................................................5, 6

*McDowell v. Calderon*,
    197 F.3d 1253 (9th Cir. 1999) ................................................................................27

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)          iii

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF AUTHORITIES
## (continued)

*Minn-Chem v. Agrium, Inc.*,
 683 F.3d 845 (7th Cir. 2012) (en banc) ..............................................................17

*Molski v. M.J. Cable, Inc.*
 481 F.3d 724 (9th Cir.2007) ...............................................................................2

*Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*,
 899 F.2d 119 (1st Cir. 1990)...............................................................................27

*Pavao v. Pagay*,
 307 F.3d 915 (9th Cir. 2002) ...............................................................................1

*Reeves v. Sanderson Plumbing Prods., Inc.*,
 530 U.S. 133 (2000)..............................................................................................1

*Rissetto v. Plumbers & Steamfitters Local 343*,
 94 F.3d 597 (9th Cir. 1996) .................................................................................2

*Royal Printing Co. v. Kimberly-Clark Corp.*,
 621 F.2d 323 (9th Cir. 1980) ..........................................................18, 19, 28, 29

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
 251 F.3d 814 (9th Cir. 2001) ...............................................................................2

*Skydive Arizona, Inc. v. Quattrocchi*,
 673 F.3d 1105 (9th Cir. 2012) .............................................................................2

*United States v. 4.0 Acres of Land*,
 175 F.3d 1133 (9th Cir. 1999) .............................................................................2

*United States v. Hui Hsuing*,
 758 F.3d 1074 (9th Cir. 2014) ...........................................................................16

*United States v. Hui Hsuing*,
 778 F.3d 738 (9th Cir. 2015) ..............................................................16, 17, 18

*United States v. LSL Biotechnologies*,
 379 F.3d 672 (9th Cir. 2004) ..............................................................15, 16, 17

*Weyerhaeuser Co. v. Atropos Island*,
 777 F.2d 1344 (9th Cir. 1985) ..............................................................27, 29

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF AUTHORITIES
### (continued)

STATUTES

15 U.S.C. § 6a.................................................................................................14, 15

RULES

Fed. R. Civ. P. 50..................................................................................................12

Fed. R. Civ. P. 50(a).............................................................................................12

Fed. R. Civ. P. 50(b).............................................................................................12

Fed. R. Civ. P. 52(b).......................................................................................27, 28

OTHER AUTHORITIES

18B Wright, C., et al., Fed. Prac. & Proc. Juris. § 4477 (2d ed.)..........................4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

## I.  INTRODUCTION

Once again, Defendants attempt to evade liability for the harm their price-fixing conspiracy caused Costco.  Defendants acknowledge that their arguments regarding injury-in-fact, antitrust standing, and the FTAIA—all of which are predicated on the false notion that Costco was required to precisely trace LCD panels (and the overcharges thereon) through the distribution chain—are foreclosed by the rulings of this Court and the MDL Court.  *See* Mot. 1 n.1.  Yet, at the same time, Defendants ignore or misconstrue the law of the case to suggest that Costco's burden was greater than it was.  And they ignore voluminous evidence supporting the jury's finding that Costco was directly injured by the price-fixing cartel.

Nor do Defendants attempt, beyond assertion and one-sided presentation of evidence, to meet their heavy burden to set aside the jury's findings that Philips and Panasonic participated in the conspiracy.  And the new arguments they raise in a last-ditch attempt to avoid the Court's ruling on standing are meritless and have been waived.  The Court should deny the motions.

## II.  STANDARD OF REVIEW

### A.  Judgment as a Matter of Law

Judgment as a matter of law is warranted only if "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151 (2000) (citations omitted). "Thus, although the court should review the record as a whole*, it must disregard all evidence favorable to the moving party* that the jury is not required to believe." *Id.* at 151 (emphasis added).

### B.  Motion for New Trial

Defendants face a similarly high burden in seeking a new trial.  The Court may "invade the province of the jury only 'if the verdict is contrary to the clear weight of the evidence, is

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

based upon false or pernicious evidence or to prevent a miscarriage of justice.'" *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.2007)). "[A] district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). Indeed, a "district court abuse[s] its discretion in ordering a new trial if the jury's verdict is not against the clear weight of the evidence." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).

## III. THE EVIDENCE SUPPORTS THE ADMITTED FACT AND JURY FINDING THAT THE CONSPIRACY INJURED COSTCO

Having conceded to the jury that Costco paid overcharges as a result of illegal conduct, Defendants are estopped from now claiming that Costco suffered no injury. But even if the Court is inclined to consider Defendants' argument, it should refuse to upend the jury's finding.

As they have so many times before, Defendants attempt to evade liability on the grounds that it is impossible to conclusively trace each LCD panel through the manufacturing chain to each of the finished products Costco purchased. But Costco was not obligated to prove the impossible, or even to present the best evidence. Rather, Costco satisfied its burden of proof of injury by establishing by a preponderance of the evidence that it paid overcharges when it purchased finished products containing price-fixed panels from the conspirators' affiliates.

### A. Defendants' Admission That Costco Was Injured Estops Them From Challenging Injury-In-Fact

"The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal." *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) (citations omitted)). "Judicial estoppel . . . precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). Yet that is precisely what Defendants do here.

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Attempting to establish credibility with the jury, Defendants and their experts repeatedly conceded that the conspiracy raised panel prices and injured Costco. With the jury having found that the harm was greater than Defendants were willing to admit, Defendants now reverse course and contend that "the jury had no reasonable basis to infer that Costco suffered *any* injury." Mot. 11 (emphasis added). Defendants are estopped from taking that position.

In its opening statement, LG Display acknowledged that Costco was harmed by the conspiracy and that "[a]t the end of this case I will stand before you again and I will ask you to award an amount of money to Costco . . . that is designed to compensate them for their *actual injury*." Trial Tr. 386:15-18 (Sept. 24) (emphasis added). AUO similarly acknowledged that "Costco is entitled to damages for its loss." *Id.* 397:14. And in its closing argument, AUO repeated that it was "willing to pay Costco fair and reasonable compensation for the damage that it suffered." *Id.* 3396:25-3397:2 (Oct. 22).

Defendants' damages experts testified that Costco paid overcharges and suffered injury. Dr. Carlton explained the overcharge rate that Defendants asked the jury to apply in calculating Costco's damages. *See, e.g.*, *id.* 2318:8-2329:20 (Oct. 14). After noting that his estimate of a "small overcharge" was statistically consistent with zero overcharge, *defense counsel* asked Dr. Carlton to clarify whether he was "saying that the overcharge, and hence Costco's damages, was zero." *Id.* 2320:11-2321:14. Dr. Carlton responded unequivocally, "No, I am not saying that," and further explained that his "best estimate" was that Costco suffered some damage as a result of the conspiracy: "I would not say that . . .my best estimate is zero." *Id.* 2321:15-25.

Similarly, Dean Snyder—who described his assignment as "to basically explain how [Costco's] damages can be calculated under different scenarios"—acknowledged that Costco suffered some damage. *Id.* 2636:4-13 (Oct. 16). Dean Snyder explained that the defense experts and Costco's expert Dr. Bernheim *agreed* on the methodology for calculating Costco's damages by multiplying the volume of commerce—the value of the panels in the finished products Costco purchased—by the overcharge rate. *Id.* 2590:5-2593:21. Asked by defense counsel to confirm

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

that "the basic formula [for calculating damages] doesn't seem to be in dispute," Dean Snyder

replied "[c]orrect." *Id.* 2593:19-21. Multiplying what he described as the "two building blocks

of damages," Dean Snyder told the jury that Costco suffered *at minimum* over $1 million in

damages based on Dr. Carlton's lowest overcharge rate. *Id.* 2588:2-9; 2614:24-2615:21 ("Now,

when . . . you use the Carlton rate . . . you get $1.6 million. . . . In some sense I view those as

starting numbers for that plea period damage calculation."). Thus, although the defense experts

attacked the amount of damage Costco suffered, they conceded that Costco was in fact injured by

paying some overcharges on the finished products it purchased.

Having repeatedly admitted to the jury that Costco in fact suffered damage, Defendants

cannot now assert that as a matter of law the jury could not have found that Costco suffered any

injury at all. *See, e.g.*, 18B Wright, C., et al., Fed. Prac. & Proc. Juris. § 4477 (2d ed.) ("Absent

any good explanation, a party should not be allowed to gain an advantage by litigation on one

theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

**B.      The Jury Reasonably Found That Costco Paid Overcharges**

Even if Defendants are not estopped from taking an inconsistent position now, their

admission that Costco was in fact injured confirms that the jury reasonably found such injury.

**1.      Costco Had A Lenient Burden for Establishing Its Injury**

Seeking to upend the jury's finding that the conspiracy proximately caused injury to

Costco, Defendants ask the Court to impose an unreasonable and unsupported standard for proof

of causation and injury-in-fact. Defendants contend that Costco was required to establish with

"certainty" that the "LCD panels manufactured by Defendants or co-conspirators were

incorporated into the finished products purchased by Costco." Mot. 6. They further claim that

absent expert testimony attempting to provide a precise rate of upstream pass-through, the jury

could not have found that the prices of LCD products Costco purchased from the conspirators'

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

affiliates were impacted by the conspiracy.  Defendants grossly exaggerate Costco's burden and ignore the substantial evidence that permitted the jury's finding that Costco was in fact injured.

Defendants' contentions regarding the standard of proof for fact of injury run contrary to black-letter law and the law of the case.  Indeed, the MDL Court rejected nearly identical arguments made by Defendants in the indirect purchaser plaintiff class case.  The MDL Court's summary of Defendants' argument there will no doubt sound familiar:

> As they have argued in the past, defendants contend that plaintiffs cannot prove their case unless they produce highly specific, individualized evidence of classwide injury.  Underlying defendants' argument is their assertion that plaintiffs must establish impact "with certainty."  Based on this standard, defendants assert that plaintiffs must identify the overcharge that was placed on every LCD panel sold during the conspiracy period and trace that overcharge through the manufacturing and retail distribution chains until plaintiffs can identify the overcharge paid by a particular class member for a particular LCD product.

MDL Dkt. 4848 at 4 (citations omitted).

The MDL Court was not persuaded:  "[T]here is no requirement that plaintiffs prove impact 'with certainty.'  To the contrary, impact, like the other elements of plaintiffs' case, must be established by a preponderance of the evidence.  In fact, antitrust plaintiffs benefit from an especially lenient burden when it comes to proof of impact."  MDL Dkt. 4848 at 5 (citing *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976)).  As such, plaintiffs "need not be able to articulate the precise degree [of] injur[y]; it suffices to show that it was more likely than not that . . . impact occurred."  MDL Dkt. 4848 at 5.

On this basis, the MDL Court found it "unnecessary for plaintiffs to provide evidence of panel-by-panel impact.  Rather, plaintiffs may resort to generalized methods of proof."  *Id.*  The MDL Court elaborated that "[a]n individual plaintiff would not be required to meet the stringent standard defendants propose."  *Id.*  The MDL Court's ruling could not have been clearer: "Plaintiffs need not identify the overcharge on each and every panel sold to direct purchasers, and they need not trace that specific overcharge through the manufacturing and retail chains to

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                    5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the ultimate purchaser. *The fact that plaintiffs lack perfect proof does not mean that plaintiffs lack any proof at all.*"[1] *Id.* at 6 (emphasis added); *see also* Dkt. 681 at 8 (acknowledging MDL Court's determination that "plaintiffs had no obligation to prove their antitrust injury on a panel-by-panel basis" because "generalized proof of injury" was sufficient).

Defendants rehash their failed arguments without even acknowledging the law of the case.[2] But try as they may to ignore the governing law and the evidence of injury detailed below, Costco readily satisfied its "especially lenient burden" of proof of injury.

### 2. The Evidence Supports the Jury's Finding That Costco Purchased Finished Products Containing Price-Fixed Panels

Defendants cannot seriously deny that the vast majority of Costco's purchases from the six affiliated vendors contained conspirator-manufactured panels. Indeed, as discussed above, their own experts admitted as much by asking the jury to calculate damages based on the value of panels contained in the products those vendors sold to Costco. *See, e.g.*, Trial Tr. 2609:9-2613:6 (Oct. 16) (Dean Snyder) (explaining volume of commerce calculation and noting agreement with Dr. Bernheim on "the volume of commerce numbers for the purpose of computing damages"). Yet Defendants take issue with the jury's finding of injury on the grounds that it is impossible to identify the source of each individual panel contained in each of the finished products Costco purchased. But as explained above, Costco was not required to establish injury on a panel-by-panel basis; generalized proof was enough. And just as the Court found the evidence sufficient to establish Costco's standing as the next-most-direct purchaser of

---

[1] As in its rulings regarding the LCD plaintiffs' standing, the MDL Court's ruling regarding proof of injury was animated in part by its intimate understanding of the LCD industry, including its findings that LCD panels are fungible commodities that are interchangeable and largely homogenous. MDL Dkt. 4848 at 5. In the words of the MDL Court, "the nature of the industry renders defendants' standard inappropriately strict." *Id.*

[2] Incredibly, Defendants once again attempt to suggest that the standard of proof for fact of injury is much higher than the "relaxed standard of proof allowed with regard to the amount of antitrust damages." Mot. 6. But the close relationship between both standards has long been recognized. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) ("Even as to this minimal quantum of injury, the standard is relaxed; otherwise, it would defeat the loose standard applied even to the amount of damages in antitrust cases.").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the conspirators' price-fixed panels, the jury reasonably determined that the evidence established

the conspirators' price-fixed panels, the jury reasonably determined that the evidence established that the finished products Costco purchased contained price-fixed panels.

The trial evidence supporting the jury's finding is voluminous and has already been catalogued in Costco's Supplemental Brief Regarding Purported "ODM Purchases." *See* Dkt. 674 at 9-16. Costco incorporates that submission by reference. As explained there, dozens of trial exhibits and extensive trial testimony confirmed that the conspirators sold their price-fixed panels to Costco's vendors or to the finished-product manufacturing affiliate within those vendors' corporate families. *See id.* at 9-14. The evidence also established that most of Costco's vendors were vertically integrated and often used their own price-fixed panels in the finished products sold to Costco. *See id.* at 14-16. Moreover, defense exhibits, testimony elicited by defense counsel, and even defense counsel's argument to the jury emphasized that Costco's vendors were among the cartel's largest customers. *Id.* at 15-16.[3]

The Court's ruling on the ODM issue leaves no doubt about the sufficiency of the evidence supporting the finding that Costco purchased products containing price-fixed panels:

> Costco was the next-most-direct purchaser of the panels incorporated in the finished products at issue. Costco's vendors were members of corporate families that included at least one entity that purchased price-fixed panels from conspirators outside that corporate family or from a panel-manufacturing conspirator within that corporate family. The evidence supports the inference that those panels were purchased for the purpose of being assembled into finished products bearing the corporate family's brand. In a few cases, that evidence is direct. . . . In other instances, the evidence is direct but less specific . . . . But in each case, the court infers that the conspirators purchased panels for the purpose of making finished products.

Dkt. 681 at 9.

---

[3] Defendants contend that Costco "offered no evidence that its overall line-up of LCD products had ever mirrored the LCD conspirators' market share." Mot. 8. But Costco's overall line-up was not at issue; damages were based solely on purchases from vendors affiliated with conspirators, which comprised only one-third of Costco's "overall line-up." As a result of that ownership/control limitation, Costco's purchases obviously "mirrored" the conspiracy, as shown by the evidence discussed in text and as Dean Snyder effectively admitted.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Rather than confront the substantial evidence underlying the Court's ruling, Defendants instead create a strawman in the form of Dr. Bernheim's market-share damages adjustment. *See* Mot. 7-8. Contrary to Defendants' suggestion, evidence of the conspirators' collective share of the panel market was not offered to establish the *fact* of Costco's injury. Rather, Dr. Bernheim testified that the conspirators' market share could be used to provide a downward adjustment in the *amount* of damages. *See* Trial Tr. 558:1-559:1; 2048:5-21 (explaining adjustment and consequential reduction in damages estimate from roughly $45 million to $43 million). In contrast to the plaintiffs in the unreported class-certification cases cited by Defendants, Costco has never suggested that it was injured simply because it purchased products "at a time when Defendants had a significant market share." *See* Mot. 7-8. Instead, having satisfied its burden of establishing injury-in-fact via the evidence described above and below, Costco offered the market-share adjustment as a tool for the jury to adjust the amount of damages. Just as the market-share evidence was not essential to the Court's finding that Costco was the next-most-direct purchaser of price-fixed panels, it was in no way necessary to the jury's finding that Costco was injured by purchasing products containing those price-fixed panels.[4]

### 3. The Evidence Supports the Jury's Finding that Defendants' Panel Price-Fixing Raised The Prices Paid By Costco

Although Costco's status as the 'next-most-direct purchaser' of price-fixed panels obviated any need to establish impact on finished products, *see infra*, Part VI, significant evidence nonetheless established that increases in panel prices in turn raised prices of the finished products containing those panels.[5]

---

[4] Although expert testimony was not necessary to establish that Costco purchased products containing price-fixed panels given the ample percipient witness testimony and exhibits regarding the same, Dr. Bernheim's testimony regarding the partial success of his panel tracing efforts provided another basis on which the jury could reach that conclusion. As Dr. Bernheim explained, "in some cases it was possible, through the records of the companies, to actually trace where the panels came from for particular products. And when that was possible, that's what I did."). *See* Trial Tr. 558:1-559:1 (Sept. 25). This testimony alone would permit a finding that Costco suffered injury through its purchase of products containing specific price-fixed panels.

[5] Indeed, although Defendants' motions do not challenge the Court's in limine ruling on upstream pass-through, their proffer was that 70-109% of panel overcharge was passed on, Dkt 614 at 2, an admission of injury-in-fact that again should estop them from making their present argument.

The conspirators themselves acknowledged the obvious links between the prices of LCD panels and the finished products containing them. Multiple witnesses confirmed this relationship and admitted to the cartel's monitoring and sharing of information regarding finished-product demand and pricing in furtherance of the conspirators' objectives.[6] Multiple exhibits further confirm that the conspirators monitored finished-product prices and understood the link between prices for LCD panels and the finished products containing them.[7] The conspirators also admitted that their illegal exchanges of forward-looking information include their views regarding the market for finished products.[8] These exchanges were hardly surprising, because

---

[6] *See, e.g.*, Trial Tr. 2085:22-2087:8 (Oct. 9) (Yul Rak Sohn [Samsung]) (acknowledging efforts to track finished product demand and "set prices," which was "important" information that permitted the conspirators to "size up the overall market as to what our position would be" because "the demands for the sets would affect our panels in terms of the market projections and forecast"); *id.* 1882:5-9, 1883:15-19 (Oct. 8) (Soo Chul Park [LG]) (confirming relationship between large-screen panel prices and prices of finished televisions in North American market and admitting that LG "provided [Toshiba] information on the U.S. market concerning the relationship of the panel price to the set price"); *id.* 834:19-835:5 (Sept. 29) (Bock Kwon [LG]) (admitting that conspirators discussed "street prices" and the relationship between panel prices and "the demand for finished products"); James CP Chien Pin Chen [AUO]) (acknowledging efforts to track "street prices" of LCD monitors in the United States and elsewhere); *id.* 1879:16-25 (Oct. 8) (Soo Chul Park [LG]) (noting that he sometimes obtained finished product prices to use as "a reference").

[7] *See, e.g.*, Trial Ex. 44 (2000 Sharp email) ("[C]urrent 15" monitor module price reduction may hit turnning LCD monitor market locket sales by street price of 15" LCD monitor:$699."); Trial Ex. 60 at 2 (200 Sharp email) (panel discussion noting Dell's "selling(street) price" for finished products); Trial Ex. 183 at 2 (2001 group meeting) ("Samsung . . . believes that there's a chance to boost TFT prices by taking advantage of the rising demand of Monitor/NBPC [notebook PC]."); Trial Ex. 189 at 27 (2002 LG cartel report) ("The street price of 15" MNT will be maintained in the US . . . ."); Trial Ex. 190 at 2 (2001 LG meeting) ("U$399/set(Street Price) is excellent positioning."); Trial Ex. 216 at 1 (2002 LG meeting with Hitachi) ("The Major 15" monitor set street price is still $399 . . . . 15" panel ceiling price seems to be $265."); Trial Ex. 221 at 1 (2002 group meeting) ("Real demands can only be determined when finished product price reflect Panel price. The price increase for monitor use panel should be slowed down or stopped until the demands are strong."); Trial Ex. 239 at 2 (May 2002 group meeting) ("The street price of laptop will climb further. The drop in CPU prices will be completely offset by the increase of TFT prices. Therefore the sales slow down of NBPC in Q2 is a result of seasonal factors and TFT price increases."); Trial Ex. 318 at 2 (2002 LG meeting with HannStar) ("If the street price goes down to around U$249, no more decrease in price is expected by the consumers therefore demand will increase."); Trial Ex. 398 at 1-2 (2003 LG email) ("As you know, the change in the panel price is usually reflected on the street set price after 2-3 months. . . . [I]n the case of the second-tier companies focusing on low price sales, Panel price increase is directly linked to the street price increase of the set."); Trial Ex. 5011 at 15 ("If inventories are diminished and panel price reductions are quickly converted into lower street prices, growth could be higher.").

[8] *See, e.g.*, Trial Tr. 928:12-929:2 (Sept. 30) (Makoto Chiba [Toshiba]) (information exchange included sharing views of "what the [retail] market price trend would be or what the market demand would be for PCs, or personal computers"); *id.* 1093:9-20 (Oct. 1) (Do Hoi Koo [LG]) (acknowledging discussion with Sharp regarding impact on panel market of retail prices for televisions in North America); *id.* 1883:15-19 (Oct. 8) (Soo Chul Park [LG]) (admitting exchanges of finished-product price information with Toshiba).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the vertically integrated conspirators knew that the price-fixed panels they sold or transferred to their affiliates were in turn incorporated into finished products sold in the United States.[9]

Testimony from Costco's fact witnesses and both sides' experts further supports the jury's finding that the prices paid by Costco were elevated by Defendants' price-fixing. First, the jury heard uncontroverted testimony that panels were significant components of the finished products that Costco purchased and thus comprised a substantial portion of those products' prices.[10] Indeed, Defendants' own experts calculated that panels represented over one-third of the cost of the finished products.[11] Furthermore, the jury heard testimony from both parties' economists indicating that because LCD panels have no independent utility, the demand for— and the price of—finished products is intimately linked to that of panels.[12]

Ignoring all of this evidence, Defendants claim that Costco "relied entirely on the econometric model created by Dr. Bernheim" to establish injury-in-fact.[13] Mot. 9. Not so. Instead, Costco satisfied its lenient burden of proof of injury by way of the substantial evidence above, which plainly supports the conclusion that raising the price of the key component in finished televisions, monitors, and other LCD products in turn generally raised the price paid by

---

[9] *See, e.g.*, Trial Tr. 1588:20-1590:12 (Oct. 7) (Sang Woo Park [LG]) (admitting that at the time he reached agreements on panel prices, he knew that LGD customers (and parent companies) Philips and LG Electronics sold finished products in the United States).

[10] *See, e.g.*, Trial Tr. 1403:18-21, 1415:3-11 (Oct. 6) (Geoff Shavey [Costco]) (testifying that Costco's vendors indicated that roughly 70 percent of the price of LCD televisions was attributable to the panel and thus that the panel was "the biggest percentage of the costs of the television"); *id.* 2992:4-2993:19 (Oct. 20) (Dr. Bernheim) (noting that the LCD panels in notebook computers comprise on average about 15 percent of the cost of the finished product and a "much higher fraction" of the cost of televisions); *id.* 2858:9-23 (Oct. 20) (Claudine Adamo [Costco]) (testifying that "the cost of the LCD was a high percentage of the cost" of a computer bundle or notebook).

[11] Trial Tr. 2613:7-16 (Oct. 16) (Dean Snyder) (comparing volume of commerce for affected products and panels and noting that "the panels are about a third of the finished products").

[12] *See* Trial Tr. 443:11-444:2 (Sept. 24) (Dr. Bernheim) (explaining that because consumers do not buy panels, the demand for finished products drives the demand for panels, with effects on price); *id.* 2289:20-2290:3 (Oct. 14) (Dr. Carlton) (noting that demand for products drives demand for panels).

[13] While on the one hand criticizing Costco's supposed reliance on Dr. Bernheim, Defendants simultaneously claim that Costco was required to adduce expert testimony calculating the rate at which panel overcharges were passed through the distribution chain to finished-product purchasers. *See* Mot 10-11. But such a requirement would run directly contrary to the law of the case that plaintiffs need not "articulate the precise degree [of] injur[y]" and instead "may resort to generalized methods of proof." MDL Dkt. 4848 at 5. Evidence demonstrating the general link between panel and finished-product pricing and confirming the conspirators' attention to "downstream" finished product prices was sufficient to show that "it was more likely than not that . . . impact occurred." *See id.*

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)

10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Costco for those products. As such, Defendants' critiques of Dr. Bernheim's methodology—which go to the unchallenged *amount* of damage and not primarily the *fact* of injury—fall flat.

But even if Costco had relied exclusively on Dr. Bernheim to show such impact, his model would have been sufficient to do so. Defendants' reliance on a handful of class-certification cases is misplaced because (1) Costco was not attempting to certify a class and (2) in any event, courts hold that such models sufficiently establish classwide impact. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008) ("[A]ntitrust plaintiffs have in recent years trended toward presenting an econometric formula or other statistical analysis to show class-wide impact. . . . This order agrees that such methods, where plausibly reliable, should be allowed as a means of common proof. To rule otherwise would allow antitrust violators a free pass in many industries."); *see also* MDL Dkt. 4848 at 8 ("Even if regression models are not enough, standing alone, to establish classwide impact, they may nevertheless be relevant to the issue. A large average overcharge, for example, might make it more likely that every direct purchaser was overcharged to some degree.").[14]

In sum, Costco satisfied any burden it had by way of evidence establishing the general relationship between panel and finished-product prices and otherwise supporting the inference that the conspirators intended that their overcharges be borne by finished-product purchasers rather than the finished-product sellers in their own corporate families.

## IV.    COSTCO ESTABLISHED ANTITRUST STANDING

Relying on largely the same arguments raised with respect to injury-in-fact, Defendants claim that the trial evidence was insufficient to establish Costco's standing under the Supreme Court's decision in *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). As Defendants finally concede, however, the

---

[14] That Defendants found a handful of variations from Dr. Bernheim's average—or simple mistakes—hardly compels a conclusion that there was no injury on most panels. *See* Mot. 10. Indeed, it is possible that the jury was somewhat persuaded by similar defense critiques at trial because it awarded less than the damages calculated by Dr. Bernheim. But it is also clear that the jury was persuaded about the proof of injury and the conspiracy's effect on the prices Costco paid.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Court—not the jury—must "determine whether Costco established its standing under *AGC* as a matter of law." Mot. 15 n.9. And *both* this Court *and* the MDL Court have already concluded that Costco has antitrust standing. *See, e.g.*, Dkt. 681 at 10 ("The findings and conclusions below are those that the court deems essential to the ultimate legal conclusion that Costco had standing to invoke the Clayton Act as to the finished product purchases that were at issue at trial."); MDL Dkt. 6931 at 3-4 ("[T]he Court has previously considered and rejected defendants' arguments concerning antitrust injury and antitrust standing. . . . [T]he Court therefore concludes that plaintiffs in this case [including Costco] have suffered the type of injury that the antitrust laws were meant to prevent."); *see also* MDL Dkt. 9144 at 3-4 ("The Court has previously ruled, on three separate occasions, that both direct and indirect action plaintiffs in this MDL were able to demonstrate antitrust injury. . . . As with the question of antitrust injury, the Court has also previously considered the question of antitrust standing in this MDL."). As these holdings make clear, and notwithstanding Defendants' inconsistent claim to the contrary, there was no lingering "factual dispute" awaiting resolution at trial to establish Costco's standing. Defendants' argument is foreclosed by the Courts' rulings.[15]

Indeed, the MDL Court's rulings—which conclusively decided the issue as to Costco—were based on the Court's well-reasoned assessment of uncontroverted (and incontrovertible) evidence regarding the relationship between LCD panels and products. Specifically, establishment of antitrust standing requires that courts assess a variety of factors, including the

---

[15] Defendants are also precluded from challenging Costco's antitrust standing on the basis of the pricing relationship between LCD panels and products because they failed to timely move for judgment as a matter of law on that ground. "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *see also* Fed. R. Civ. P. 50 advisory committee's notes to the 2006 amendments ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."). In their written submission in conjunction with their motion for judgment as a matter of law, Defendants argued that the evidence was insufficient to establish antitrust injury because "Costco needed to show that the market for TFT-LCD panels and the market for finished products containing such panels were one and the same" and there was insufficient evidence that panels and products were "interchangeable" or "reasonable substitutes" for one another. Dkt. 621 at 1-3. Defendants did not preserve the argument they now make, namely, that Costco was required to prove that "price-fixing in the panel market affected the prices that Costco's vendors paid or that the overcharges were 'traceable' to the finished products Costco purchased." Dkt. 689 at 14. Although the evidence in any event supports that finding, Defendants' motion is untimely and must be denied.

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

nature of the injury, the causal connection between the violation and the harm, whether

defendants intended that harm, whether the plaintiff was a consumer or competitor in the market,

the directness of the injury, and whether damages are speculative or duplicative.  *See, e.g.*, MDL

Dkt. 6931 at 2.  Applying those factors, the MDL Court concluded (and repeated its conclusion

in several orders) that the evidence sufficiently established Costco's standing:

> [P]laintiffs have presented evidence that the markets for LCD
> products, including mobiles phones and DSCs, and LCD panels are
> inextricably linked; that LCD panels are discrete components of
> LCD products; that they have no independent utility; and that
> almost no demand exists for them outside of the demand for LCD
> products. . . .  [I[t is appropriate to analyze the LCD product and
> panel markets together. . . .  [P]laintiffs' injuries flowed directly
> from the price-fixing conspiracy, and are not too speculative.
> Finally, while the risk of duplicative recovery and the potential
> complexity of damage apportionment is present, the Court is
> satisfied that the nature of plaintiffs' injuries and the direct chain
> of causation between their injuries and defendants' anticompetitive
> conduct place this case squarely within the type of suit the antitrust
> laws were meant to address."

*Id.* at 3-4 (citations and punctuation omitted); *see also* MDL Dkt. 9144 at 3 ("LCD panels

possess no independent utility outside of the demand for LCD products, and . . . the market for

LCD panels cannot, therefore, be severed from the market for LCD products.").[16]  Accordingly,

the MDL Court concluded that Costco satisfied the requirements for antitrust standing.

To be sure, even if the MDL Court had not already decided the issue of Costco's antitrust

standing—which it has—the evidence at trial would readily support the same now.  As detailed

in Part III.B, *supra*, the undisputed evidence established that because LCD panels have no

independent utility, demand for panels is driven by demand for finished products.  The evidence

also confirmed that panels are significant components in finished products, comprising up to 70

---

[16] Defendants assert that the "Ninth Circuit has not endorsed [the MDL Court's] 'inextricably linked' approach," Mot. 14 n.8, but they neither challenge the MDL Court's formulation nor deny that it is the law of the case.  Notably, other district courts within the Ninth Circuit have found the antitrust-injury requirement met based on the link between the price-fixed component and the end product purchased by plaintiffs. *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1143, 1153-54 (N.D. Cal. 2009) ("[W]hile the markets for NAND flash memory and products that contain NAND flash memory technically may be different, in practice, both markets are inextricably intertwined."); *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1112-13 (N.D. Cal. 2013) ("[A]n anticompetitive effect on the market for the licensing of these logos and trademarks would necessarily have an effect on the consumer retail market for that apparel bearing those logos and trademarks").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

percent of the price of the finished product. And it established that the conspirators sold their panels to customers for incorporation into finished products sold in the United States. Although Costco was not required to once again establish *AGC* antitrust standing at trial, this evidence was more than sufficient to do so.

## V. THE EVIDENCE SUPPORTS THE JURY'S FINDING THAT COSTCO'S FEDERAL CLAIM WAS PERMITTED UNDER THE FTAIA

Defendants claim that the impossibility of precisely tracing overcharges through the distribution claim also requires that the verdict be "set aside under the FTAIA." Mot. 15. But evidence more than sufficiently supports the jury's findings regarding the applicability of the "import commerce" exclusion and the "domestic effect" exception to the FTAIA. And even if Defendants' claims about the FTAIA were meritorious, there would be no basis to set aside the verdict because the jury also found that Defendants' conduct violated Washington law, which imposes no domestic-impact requirement.[17]

### A. The Import-Commerce Exclusion Was Satisfied By Evidence of Transactions Between a Member of the Conspiracy and a Customer in the United States

By its terms, the FTAIA does not apply to "import trade" or "import commerce." *See* 15 U.S.C. § 6a; *see also F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). This exclusion is reflected in the Court's instruction to the jury, which provides that the Sherman Act applies if "sales of LCD panels whose prices were fixed by the conspiracy or finished products containing LCD panels whose prices were fixed by the conspiracy . . . were sold in a transaction between a member of the conspiracy and a customer in the United States." Dkt. 622 at 30 (Inst. No. 25).

Defendants claim that because Costco's vendors were not conspirators, the jury could not have found that the import-commerce exclusion applies. Mot. 16. But neither the FTAIA nor

---

[17] The Court's instruction on this point could not be more clear: "As it applies to this case, Washington antitrust law is the same as federal antitrust law in all respects, except for one difference. Costco does not need to prove an impact on domestic commerce to prove its Washington antitrust claim." Dkt. 622 at 36 (Inst. No. 30).

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                          14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the Court's instruction requires that *Costco's* finished-product purchases be made from a conspirator. Instead, the jury was free to find the exclusion satisfied on the basis of the conspirators' imports of panels and finished products to their U.S. affiliates for resale to Costco.[18] Indeed, the jury heard evidence that the conspirators sold their panels or finished products to the U.S. vendors that in turn sold to Costco. *See infra* Part III.B.2; *see also* Trial Tr. 2751:10-2753:7 (Oct. 16) (Masahiro Yakota [Sharp]) (explaining that Costco vendor Sharp Electronics Corporation purchased finished products from conspirator Sharp Corporation at prices set by Sharp Corp.); *id.* 2738:9-2741:9 (Oct. 16) (Carl Pinto [Toshiba]) (conspirator Toshiba procured panels from conspirators Samsung, LG, and Toshiba, which were sold or transferred to Costco vendor Toshiba *America* Information Systems for sale in the U.S. market). Considered in conjunction with the substantial evidence of panel sales to Costco's vendors and the undisputed fact that all of Costco's purchases from the conspirators' affiliates took place in the United States, it was reasonable for the jury to find the import-commerce exclusion satisfied.

**B.    The Domestic-Effects Exception Was Satisfied By Evidence of the Conspiracy's Impact on Prices Paid by Finished-Product Purchasers in the United States**

Independently, substantial evidence permitted a finding that the "domestic effects" exception to the FTAIA was satisfied. The domestic-effects exception provides that the Sherman Act reaches foreign panel or finished-product sales that had a "direct, substantial, and reasonably foreseeable effect on later sales to a customer in the United States." Dkt. 622 (Inst. No. 25); *see also* 15 U.S.C. § 6a; *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 159 (2004). The Court instructed the jury that the "direct" effect component was satisfied by a showing that the foreign sales had "an immediate impact on the later sales, which is to say that the impact does not depend on uncertain developments." *Id.*[19]

---

[18] Alternatively, as explained in Part VI, *infra*, Costco's status as the next-most-direct purchaser of the conspirators' price-fixed panels should mean that Costco's purchases of finished products from the conspirators' affiliates are effectively purchases of panels from the conspirators—and there is no dispute that those Costco purchases occurred in United States.

[19] Although the Court's requirement of "immediate impact" is consistent with the Ninth Circuit's ruling in *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004), Costco contends that the standard imposed by

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Defendants take issue not with the jury instructions but with the jury's finding of direct effect. Repackaging their argument regarding injury-in-fact, Defendants suggest that the conspiracy's direct effect could have been established only via expert testimony detailing the pass-through of overcharges to Costco. *See* Mot. 18. But neither the Court's instruction nor the prior rulings by this Court or the MDL Court require such exacting proof of domestic impact. Rather, Costco was merely required to establish by a preponderance of the evidence that the conspirators' price-fixing of the key components in finished LCD products had an "immediate impact" on the prices of the products their affiliates sold to Costco. Costco satisfied this burden by way of the evidence detailed in Part III.B, *supra*, which permitted the jury's finding that the prices paid by Costco were directly impacted by the cartel's misconduct.

The sufficiency of the evidence is confirmed by the Ninth Circuit's amended decision upholding the criminal convictions of Defendant AUO and its executives, involving the same conspiracy and flow of commerce. The amended decision was issued subsequent to the parties' briefing on the FTAIA issue and the Court's instruction to the jury. *See United States v. Hui Hsuing*, 778 F.3d 738 (9th Cir. 2015), *cert denied*, 135 S. Ct. 2837 (2015). As the Court will recall, in the Ninth Circuit's now-superseded opinion in *Hui Hsiung* the appellate panel found the evidence sufficient to satisfy the import commerce exclusion and declined to address the sufficiency of the evidence of domestic effect. *See* 758 F.3d 1074, 1092-94 (9th Cir. 2014). But in its amended decision, the court evaluated the evidence and concluded that the domestic-effects exception was satisfied because "[t]he constellation of events that surrounded the conspiracy leads to one conclusion—the impact on the United States market was direct and followed 'as an immediate consequence' of the price fixing." 778 F.3d at 759. That finding was based on evidence, just as Costco presented, of the cartel's impact on the prices of finished products sold

---

*LSL* is unduly strict. Indeed, in affirming the criminal convictions of AUO and its executives for LCD price fixing, a three-judge panel of the Ninth Circuit acknowledged the Second and Seventh Circuits' disagreement with *LSL* but noted its inability to "reconsider the stricter standard" imposed by the prior panel decision in *LSL*. *United States v. Hui Hsuing*, 778 F.3d 738, 758 n.9 (9th Cir. 2015). Costco reserves its right to argue on appeal that *LSL* imposes an inappropriate standard for causation of "domestic effects."

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                        16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

in the United States. *See id.* And that evidence was presented not via expert analysis of pass-through rates but rather via generalized proof of impact like the evidence detailed above. *Id.*

Specifically, the appellate court highlighted evidence that "TFT-LCDs are a substantial cost component of the finished products—70-80 percent in the case of monitors and 30-40 percent for notebook computers"; that "[o]ne of the trial witnesses explained the correlation [between panel and product prices]"; and that although many panels were sold overseas, "[i]t was well understood that substantial numbers of finished products were destined for the United States and that the practical upshot of the conspiracy would be and was increased prices to customers in the United States." *Id.* On the basis of this evidence indicating that "price-fixed panels were imported into the United States as part of finished products," the court found an "integrated, close and direct connection between the purchase of price-fixed panels, the United States as the designation for the products, and the ultimate inflation of prices in finished products imported to the United States." *Id.* The court also noted that "[t]his case is unlike *LSL Biotechnologies*, where the effect of an agreement between United States and foreign firms rested on speculation as to future innovation in tomato seeds and lacked an existing effect on American tomato consumers. Nor does this conspiracy fall into the category in which 'action in a foreign country filters through many layers and finally causes a few ripples in the United States.'" *Id.* at 759-60 (quoting *Minn-Chem v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012) (en banc)). Accordingly, the court upheld the jury's finding of proof of domestic effect beyond a reasonable doubt.[20] *Id.*

Similarly, here the jury reasonably determined that Costco established by a preponderance of the evidence that the cartel's price fixing had a direct and immediate effect on the prices of finished products purchased by Costco. As in *Hui Hsiung*, the jury heard

---

[20] Defendants relegate their discussion of *Hui Hsiung* to a footnote and downplay its holding by suggesting that a different standard might apply in civil damages actions. *See* Mot. 17 n. 10. But nothing in the court's decision suggested that a private plaintiff would be unable to satisfy the more lenient civil burden of proof with similar evidence.

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                    17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

uncontroverted evidence that price-fixed panels were the key component in the finished products Costco purchased. *See supra* Part III.B. The jury also heard extensive testimony regarding the links between the demand and pricing of panels and finished products. *Id.* And it heard the conspirators acknowledge the importance of finished-product sales in the U.S. market and the cartel's efforts to monitor the downstream impact of the panel price-fixing. *Id.* The jury may have also been persuaded by evidence indicating that the finished-product purchases in question were made from the domestic affiliates of the panel conspirators—a fact that lent further support to the inference that the cartel's intended targets were U.S. customers like Costco. *Id.* In the face of this substantial evidence, the jury heard no evidence undermining the causal link between increases in foreign panel prices and elevated finished-product prices in the United States, or otherwise suggesting that the cartel's impact on Costco was anything but direct. As such, the jury's verdict must stand.

## VI. COSTCO'S BURDEN MUST BE EVALUATED THROUGH THE LENS OF THE OWNERSHIP/CONTROL RULE

Stating the obvious, Defendants note that the ownership/control rule does not "excuse Costco" of establishing antitrust injury and domestic effect. Mot. 18. But Defendants are wrong to assert that Costco must prove impact without regard to the panels themselves and solely on the basis of finished products. And even if Costco was required to prove impact on finished products, *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977), and its progeny confirm that evidence of pass-through rates on the *specific* products Costco purchased was not required.

In *Illinois Brick*, the Supreme Court held that the direct purchaser of a price-fixed product, and not others in the chain of distribution, may recover the entire overcharge. 431 U.S. at 734-35. In concentrating recovery in the first purchaser, the Court sought to avoid the evidentiary complexities associated with evaluating pass-through rates to downstream purchasers. *Id.* at 737-38. Expounding on the ownership/control exception recognized in *Illinois Brick*, the Ninth Circuit's decision in *Royal Printing* confirmed that where a plaintiff purchases from a

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

conspirator's affiliate rather than the conspirator itself, the plaintiff is entitled to recover "the entire overcharge," regardless of the degree of any upstream or downstream pass-through of overcharges. *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980).

As this Court has noted, the *Royal Printing* court "ruled that a price fixer in a control relationship with a vendor cannot defend itself by '[d]etermining what portion of the illegal overcharge was 'passed on' to [the purchaser] and what part was absorbed by middlemen,' because doing so would 'involve all of the evidentiary and economic complexities' that the Supreme Court 'clearly forbade'" in *Illinois Brick*. Dkt. 569 at 3. On this basis, this Court prohibited evidence regarding the rates at which panel overcharges were passed through to the finished products that Costco purchased. *See id.* And the Court properly instructed the jury that Costco's damages were to be based on overcharges on the panels in the products Costco purchased—not the increased price of the finished product itself. Dkt. 622 at 32 (Inst. No. 27).

Despite the clear prohibition on evidence of upstream pass-through in Sherman Act cases, Defendants claim that Costco was required to put forth precisely such evidence to establish antitrust standing and direct effect. Citing *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), Defendants posit that evidence of pass through is required in a "component" case such as this one. Mot. 19-20. But *ATM Fee*'s recitation of the plaintiffs' allegation regarding the defendants' "pass on" of interchange fees says nothing about a plaintiff's burden of establishing standing under the control exception, much less about *AGC* standing or direct effects under the FTAIA. 686 F.3d at 749-50. *ATM Fee* did not modify *Royal Printing*'s command that the next-most-direct purchaser may recover the entire overcharge without consideration of upstream pass-through. Indeed, as the MDL Court recognized, "[t]he *ATM Fee* opinion never suggested any intention to alter the standard in *Royal Printing*." MDL Dkt. 7188 at 5.

Costco's status as the next-most-direct purchaser of the conspirators' price-fixed panels permits Costco (like other plaintiffs) to point to that panel overcharge as evidence of the direct

injury it suffered. Otherwise, cases like this would always involve "all of the evidentiary and economic complexities" that the Supreme Court forbade in *Illinois Brick*.

Of course, even were Costco required to prove impact on finished-product prices notwithstanding *Illinois Brick*, its progeny, and this Court's order, these decisions at minimum inform the burden by which Costco must prove impact. It cannot be true, as Defendants suggest, that a plaintiff must adduce expert testimony of upstream pass-through rates with mathematical certainty. At most, a plaintiff would be required to provide generalized proof that the conspirators' price-fixing of the key components in finished products sold by their affiliates tends to raise the prices of those finished products. *See also* MDL Dkt. 4848 at 6 ("Plaintiffs need not identify the overcharge on each and every panel sold to direct purchasers, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser. The fact that plaintiffs lack perfect proof does not mean that plaintiffs lack any proof at all."). Costco plainly made that showing.[21]

## VII. COSTCO CAN RECOVER FOR ITS PURCHASES FROM PHILIPS AND PANASONIC

The evidence is more than sufficient for the jury to have found that Philips and Panasonic participated in the price-fixing conspiracy. And even if there was no evidence that they conspired, Costco can recover for damages on its purchases from those vendors because of their ownership/control relationship with other conspirators.

### A. The Evidence Supports the Jury's Finding that Philips Was a Conspirator

Despite the jury's unequivocal finding that Philips conspired, Defendants contend that the jury "could not have reasonably concluded that Royal Philips was a participant in the TFT-LCD panel conspiracy." Mot. 24. The record belies Defendants' position.

---

[21] In light of that showing, the Court may find it unnecessary to determine whether a plaintiff like Costco proceeding under the control exception may rely exclusively on evidence of impact on prices of the component rather than the end product.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Defendants rely on the undisputed fact that Philips did not physically attend the "Crystal Meetings." Mot. 23. That tired argument shows just how little Defendants care about satisfying the applicable standards. That Philips did not physically attend those meetings is meaningless because the evidence showed, and the jury found, that the conspiracy extended far beyond those particular meetings—to include nearly twenty additional conspirators who did not physically attend those meetings, to include panels that were not always discussed at those meetings, and to include additional conspiratorial exchanges and gatherings that occurred in the years prior to and in conjunction with the "Crystal Meetings." Even Defendants' expert admitted that physical presence is not necessary to effectuate a conspiracy. *See* Trial Tr. 2399:18-19 (Oct. 15) (Dr. Carlton) ("Well, if you are out of the room, but in the conspiracy, that is like being in the room."), 2400:5-8 (same).[22]

Moreover, substantial evidence permitted the jury to find that Philips participated in the conspiracy. Emails from conspirators revealed exchanges with Philips involving precisely the same type of confidential information communicated in precisely the same manner as was common throughout the conspiracy. For example, Philips relayed to competitor Epson[23] via "telephone" its confidential future production ("supply schedule is being moved up from January to December. 500k/month") and pricing ("Q4: $18.75 Q1: $17.75") information. Trial Ex. 924.

Sharp's Kazuyoshi Nakayama—an active cartel participant—likewise circulated an email in which he relayed confidential future pricing and production information from conspirators

---

[22] *See also* MDL Dkt. 4097 at 2 ("[T]he record contains . . . evidence that defendants exchanged production and capacity figures at Crystal meetings, *Vendor Parties, bilateral meetings, and via joint ventures* as a means of balancing production capacity and stabilizing prices." (emphasis added)).

[23] Defendants' contend that Epson did not produce TFT LCD's until the fall of 2004, yet Defendants ignore the several exhibits reflecting conspiratorial conduct between Epson and Philips during and after that time period. *See, e.g.*, Trial Exs. 914 (Oct. 2004), 924 (Oct. 2004), 936 (Nov. 2004). Moreover, contrary to Defendants' contention, the jury was not required to find Epson's Takato Imai credible regarding the timeframe of TFT production, particularly because he repeatedly evaded answering questions when confronted with inculpatory evidence and denied breaking the law despite that evidence. *See, e.g.*, Trial Tr. 1946:9-14 (Oct. 8) ("Q. You say, at the top of this email, 'This content is usual talk, but it is an information exchange with competitors, so please handle with care.' Why were you concerned about how the information in this email would be handled? A. I do not remember."), 1947:22-24 ("Q. Did you ever come to the conclusion that your exchanges of information with competitors was illegal? A. And my answer is no."), 1976:24 (Oct. 9) ("I have never entered an agreement to fix price.").

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                    21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

AUO, Chi Mei, HannStar, Hitachi, Toshiba, Samsung, and Philips. *Id.* at 1-2. Nakayama "asked about next year's demand forecast in the talk with Philips," and Philips confirmed that "monitor panel are in shortage," that "[e]veryone is unwilling to make 15"," that "17" is the focus," and that "19" is increasing." *Id.*

Defendants contend that "the only specific inference that can be drawn" regarding Philips is that "the Philips monitor division was a customer of Sharp's." Mot. 24 (emphasis in original). But the jury obviously rejected Defendants' oft-repeated assertion that such exhibits merely recorded permissible buyer-seller exchanges.[24] Moreover, Defendants' self-serving inference requires that the jury ignore the entirety of the remaining email, all of which involves competitors that the jury found participated in the conspiracy exchanging the same confidential information that the jury found was part and parcel of the price-fixing conspiracy. It defies credulity to contend that the "only" inference to draw is that an admitted conspirator circulated an email chronicling its criminal activity with six other conspirators only to insert in the middle of that email a separate, innocent exchange with another competitor.

Indeed, the question of whether such communications were "innocuous," as Defendants characterize them, or part and parcel of the broader conspiracy, was for the jury to answer. *See, e.g.*, Dkt. 622 at 25 (Inst. No. 22) (instructing that a conspiracy does not require that "members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was" and that it "may be disclosed by the circumstances or by the acts of the members . . . as well as from the words they used."), at 28 (Inst. No. 23) (instructing that a conspirator is "responsible for all actions taken by all other members during and in furtherance of the conspiracy").

Nor is there merit to Defendants' contention that other exhibits involving Philips reflect conspiratorial communications limited to STN LCD panels, which were not part of Costco's

---

[24] *Compare* Trial Tr. 3374:2-20 (Oct. 22) (LG Closing Argument) (arguing that Toshiba's exchanges with conspirators were lawful buyer-seller communications), *with* Dkt No. 628 (Verdict) (finding that Toshiba was a member of the price-fixing conspiracy).

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

damages claim. Mot. 24. Those exhibits show not only opportunity and method but also include illegal exchanges of confidential information about panels *not* identified as STN. *See, e.g.*, Trial Ex. 0924 (Oct. 2004) (conspiratorial exchanges regarding panels for projects "Amazon," "J&J," "Halti 2," and "Moscow"—none of which are identified as STN); Trial Ex. 0936 (Nov. 2004) (exchanging confidential information about the combined LCD market, as well as panels for projects omitted from the "STN" portion of the email and referenced instead under the "Active" panel types, including "Ama[z]on," "Halti2," "J&J," "Moscow," "K2," "Suez," and "Izu"); *see also id.* at 4 ("P company total:  B/W 22 M  CSTN: 51M  *Active: 13 M*  Total: 86 M") (emphasis added);[25] Trial Ex. 1056 at 1 (identifying TFT-LCD as "Active" panels); Trial Ex. 1223A (distinguishing between sales of STN and "Active" panels).  Like the hundreds of similar conspiratorial exchanges revealed at trial, these exchanges further confirm that Philips was participating in the same anticompetitive conduct.[26]  Accordingly, the evidence was more than sufficient for the jury to find that Philips was a member of the price-fixing conspiracy.

## B.    The Evidence Supports the Jury's Finding that Panasonic Was a Conspirator

The same is true with Panasonic (formerly Matsushita).  The evidence was more than sufficient for the jury to find that Panasonic was a member of the price-fixing conspiracy, and Defendants repeatedly ignore direct and circumstantial evidence of its participation.

Initially, and critically, Defendants fail to mention that Hitachi's Genichi Watanabe— who testified to early meetings and exchanges of confidential price-related information with competitors Sharp, Samsung, LG, Toshiba, NEC, AUO, and Chi Mei—*admitted* that he met with

---

[25] Notably, this email and several other Epson emails refer to Philips clandestinely, using only the letter P, just as Toshiba's Yasuhisa Iida advised to avoid detection.  *See* Trial Ex. 1295 at 1 ("The following mail is extremely sensitive, and so I suggest that you 1) distribute the mail only to limited members, and 2) avoid using real names and direct expressions.  It should be OK if you say write something like 'According to the information from our reliable sources, our competitor T has quoted $16…' Then convey the details over the phone.  Email creates an enduring record.  We have to be careful about Compliance.").

[26] *See, e.g.*, Trial Ex. 914 (Oct. 2004 Hitachi email) ("In order to avoid price mudslinging with [Philips] and SDI, we would like to mutually cooperate on cell sales prices."); Trial Ex. 936 (Nov. 2004 Epson email) ("P company meeting. . . .  The ask price at the time of the start of mass production will be $8.68. . . .  In 2004 4Q, P company was $26.25.  In 2005 4Q, it plans to present through to $22.33.").

competitor Matsushita "[t]wo, three times." Trial Tr. 715:11-17 (Sept. 25). Sakai Someya, another Hitachi LCD employee actively involved in the conspiracy, accompanied Watanabe to the meetings with Matsushita. Trial Tr. 716:2-4 (Sept. 25). Watanabe confirmed that the Matsushita representative was a plant manager for LCDs and that Watanabe "gave my idea about the Japanese manufacturers' destiny, and I wanted his opinion." Trial Tr. 716:14-15 (Sept. 25). There was no procompetitive or lawful justification for those meetings, and they involved the same type of exchange that the jury found was a component of the conspiracy.

Moreover, Defendants omit C.C. Liu's testimony in which he confirmed that from "1999 to the fall of 2001," Chunghwa engaged in one-on-one meetings with competitor Matsushita. Trial Tr. 1107:5-1108:8 (Oct. 1); *see also* Trial Tr. 997:8-10 (Sept. 30) (Brian Lee [Chunghwa]) (testifying that Matsushita was one of "CPT's competitors from Japan"). Liu admitted that the competitors were "focusing on price information exchange" during those unlawful meetings. Trial Tr. 1107:5-13, 1108:7-8 (Oct. 1). Liu further testified that he directed his employees to meet with those competitors, including Matsushita, to exchange nonpublic information: "Q. [D]id you direct them to meet with competitors as well? A. That's their job description." Trial Tr. 1108:10-11 (Oct. 1). This evidence alone is sufficient for the jury to have found that Panasonic was a member of the conspiracy.

Ignoring that critical evidence, Defendants instead contend that a single Chunghwa document, Trial Ex. 11, could not have reflected any anticompetitive behavior because the particular meeting with Matsushita identified in that exhibit occurred in December 1998, just before Chunghwa began manufacturing LCD panels. Mot. 25. Of course, Chunghwa was in the process of beginning its LCD production and in anticipation of that production sought Matsushita's proprietary pricing and production plans, including information about projected sales in 1999 and 2000. Trial Ex. 11 at 1. Even when Defendants pressed Liu to admit that Chunghwa was not interested at that time in Matsushita's pricing intentions, he did not agree: "Q. You weren't concerned about their pricing, were you? A. We tried to learn from them. Q.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

You were trying to learn from them about the industry, right?  A. Yes, and the price was very important as well." Trial Tr. 1133:8-11 (Oct. 1).[27]

Even if this document did not reflect conspiratorial behavior by Matsushita because Chunghwa had not yet manufactured LCD panels,[28] as noted above, Mr. Liu confirmed that he met with Matsushita multiple times after production began.  And when Defendants attempted to limit Chunghwa to a particular meeting in the absence of other written reports, Mr. Liu again confirmed that additional meetings occurred and that coordinating prices was a routine part of the job:  "[T]here must be such reports.  It's just that I do not recall those.  Otherwise, how could we be performing our duties in the course of our employment?"  Trial Tr. 1134:10-12 (Oct. 1).

There is more.  Defendants contend that two additional exhibits on which Costco relies simply identify meetings between conspirator LG and Matsushita, and they assert that such meetings are not illegal.  Mot. 25.  But those documents do not merely identify innocent buyer-seller meetings; they identify meetings between *other conspirator companies* and *other individual participants in the conspiracy*.[29]  Defendants have offered no evidence that would categorically rebut the inference that these exhibits reflect coordination of additional price-fixing meetings, of which Matsushita was a participant.[30]  Try as Defendants might to have this Court

---

[27] Noting that the transcript at some points in this discussion refers to "Mitsubishi" rather than "Matsushita," Defendants assert that "Costco dropped any claims that Mitsubishi participated in the conspiracy prior to trial."  Mot. 26 n. 15.  However, Costco merely dropped its claim for *damages* on purchases from Mitsubishi.  *See* Trial Tr. 3088:4-9 (Oct. 21).  Costco continued to allege—and the jury found—that Mitsubishi participated in the conspiracy.  Dkt. 628 (Jury Verdict) at 2.

[28] Defendants also ignore the inculpatory nature of the exhibit, which, particularly when combined with other testimony about its illegal conduct, confirms that Matsushita had been and was willing to meet with competitors to exchange confidential pricing and production information.

[29] Trial Exhibit 0979 is an email from LG's D.H. Koo—an active participant in the conspiracy—arranging a meeting with Matsushita while simultaneously scheduling a "Green Meeting with [conspirator] Toshiba CEO," another meeting with conspirator NEC, and a third meeting with conspirator Hitachi, specifically identifying Hitachi's Fumyaki Yonai, who was also an active participant in the conspiracy.  Similarly, Trial Exhibit 1024 is a report of D.H. Koo's travel schedule, identifying a "dinner with Toshiba," a meeting with "Hitachi Yonai," an "NEC meeting" and another "Meeting and Dinner with Matsushita's Morita VP."

[30] Defendants similarly contend that no reasonable jury could find that Trial Ex. 99 is probative of whether Matsushita was involved in the conspiracy because although it confirms that "consensus has been made among LG, Samsung, CPT, Mitsubishi, and HannStar," the proprietary information about Matsushita came from a "separate source."  *Id.*  But nothing prohibits the jury from concluding that the unidentified source was someone at Matsushita, particularly where the *entire* email records illegal communications with other conspirators and the author cautioned all recipients to "Please do not pass this mail to others."  *Id.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

view each piece of evidence in isolation and without context, the law requires—as the Court so instructed the jury—that the evidence be viewed in its entirety.  *See* Dkt. 622 at 26 (Inst. No. 22) ("In determining whether a conspiracy has been proved, you must view the evidence as a whole and not piecemeal.").  When viewed through that lens, the evidence of Panasonic's culpability is not only sufficient but overwhelming.

## C.    Philips and Panasonic Were in Ownership/Control Relationships with Conspirators

Even if there were insufficient evidence from which the jury could find that Philips and Panasonic were members of the conspiracy, Costco is entitled to recover for damages on its purchases from Philips Electronics North America Corporation ("PENAC") and Panasonic Corporation of North America ("PCNA") because of those vendors' ownership or control relationships with other conspirators.  Costco may recover overcharges on its Philips purchases because PENAC is wholly owned and controlled by Royal Philips Electronics N.V. ("Royal Philips"), which in turn owned and controlled conspirator LG Display ("LGD") with LG Electronics.[31]  Costco is likewise entitled to recover its Panasonic purchases because PCNA is a wholly owned subsidiary of Panasonic Corporation ("Panasonic"), which has an ownership/control relationship with conspirators IPS Alpha Technology, Ltd. ("IPS Alpha") *and* Toshiba Matsushita Display Technology Co., Ltd. ("TMD").[32]  As such, the jury's damages

---

[31] The parties stipulated that Royal Philips owned 100 percent of PENAC from January 1, 1998, through at least November 2010, Dkt. 599 (Control Stipulation) at 7, and Royal Philips owned or controlled conspirator LGD. Specifically, Royal Philips and LG Electronics, Inc. ("LGE") entered in July 1999 a joint venture agreement concerning the research, development, manufacturing, sales, and marketing of TFT-LCD products.  *Id.*  Pursuant to the agreement, LGE and Royal Philips each obtained 50 percent ownership interests in LGD.  *Id.*  Tellingly, Article I, Section 1.1 of the agreement defined the term "control" as "direct or indirect ownership of 50% or more of the outstanding voting securities of a corporate Person with the right to vote for the election of directors or the equivalent thereof."  *Id.*  Furthermore, Royal Philips controlled LGD through its control of the company's board of directors.  *Id.* at 8-9 (procedure for Royal Philips to nominate and vote on board members, generally consisting of control over half of the board).  LGD's 20-F for the fiscal year ended December 31, 2004, states that LGE and Royal Philips "have significant influence over corporation decisions" and "together have control over all matters submitted to our shareholders for approval."  *Id.* at 10.  Even after the sale of a portion of their ownership interest in 2004 and 2005, Royal Philips and LGE controlled LGD's board of directors and its executive officers.  *Id.* at 10-15.

[32] The parties stipulated that Panasonic owned 100 percent of PCNA from January 1, 1998, through at least November 2010, *id.* at 6, and Panasonic owns and controls conspirator IPS Alpha.  Specifically, in October 2004, Panasonic entered an agreement with conspirators Toshiba Corp., Hitachi Ltd., and Hitachi Displays Ltd. creating IPS Alpha—an LCD television-panel joint venture.  *Id.* at 6-7.  Panasonic's initial ownership interest in IPS Alpha was between 21 percent and 25 percent.  *Id.* at 7.  In March 2008, IPS Alpha became a consolidated subsidiary of Panasonic *Id.*  At that time, Panasonic held a 44.9 percent ownership interest in IPS Alpha, and in 2010 its

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                        26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

award would stand even if its findings of Philips's and Panasonic's participation in the conspiracy did not.

## VIII.  THE COURT CORRECTLY DETERMINED THAT COSTCO HAS STANDING

### A.  Defendants Face a High Burden in Seeking Amendment

As Defendants acknowledge, amendment is proper only if the Court has made "manifest errors of law or fact" or "to prevent manifest injustice." Mot. at 26 (quoting *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999)).  "Motions made under [FRCP 52(b)] are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories of law." *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D. Ill. 1976).  Indeed, motions to amend "cannot be used to raise arguments which could have been raised prior to the issuance of judgment." *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1397 (8th Cir. 1996); *see also Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990) (motion may not be used to "rehash old arguments already considered and rejected by the trial court").  Moreover, amendment is not required if the alleged errors would not affect the outcome of the case. *See Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1352 (9th Cir. 1985) (district court did not err in denying motion for additional findings where court's separate findings rendered the proposed additional findings irrelevant).

### B.  The Court Correctly Interpreted and Applied the "Control" Exception

Seeking to eviscerate the "ownership" prong of the "ownership <u>or</u> control" exception to *Illinois Brick*, Defendants claim that the Court committed manifest error by finding that the

---

ownership interest increased to 92 percent. *Id.*  Effective October 1, 2010, IPS Alpha's name was changed to Panasonic Liquid Crystal Display Co., Ltd. *Id.*  During the conspiracy, IPS Alpha was not only owned or controlled by five conspirators but was also a party to pricing and output agreements entered into by the conspirators at the meetings.  And now it is owned/controlled (albeit under a different name) by Panasonic.  Moreover, Panasonic also partnered with conspirator Toshiba to create conspirator TMD in 2002.  During the conspiracy period, Panasonic owned a 40 percent stake in TMD and held four out of ten seats on TMD's board of directors. *Id.* at 2.  Beyond this substantial ownership interest, Panasonic exercised control over the Board of Directors through its veto power over most key Board activities, including litigation decisions. *Id.* at 2-6.

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                             27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

exception applied to "wholly-owned subsidiaries of conspirators or conspirators' subsidiaries." Mot. 27 (quoting Dkt. 681 at 11). Defendants do not—and indeed cannot—suggest that the Court's ruling was inconsistent with Ninth Circuit law, the law of the case established by the MDL Court, or this Court's prior ruling on the control issue. Instead, they claim that the Court erred by failing to apply a lone out-of-circuit district court decision. *Id.* (discussing *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 1010 (E.D.N.Y. 2012) ("*Vitamin C*")). Not only does their argument flaunt the requirements of Rule 52(b), it is untenable under the controlling law, which the Court properly applied.

As a threshold matter, Defendants are precluded from using this post-trial motion as a vehicle to request application of *Vitamin C* because they could have raised this argument earlier yet failed to do so. Never in the dozens of briefs before the MDL Court or this Court did Defendants argue that *Vitamin C* impacts plaintiffs' standing under the ownership or control exception. On this basis alone, Defendants' motion must be denied. *See Diocese of Winona*, 89 F.3d at 1397 (motion to amend "cannot be used to raise arguments which could have been raised prior to the issuance of judgment").

In any event, *Vitamin C*'s suggestion that a parent-subsidiary relationship might not satisfy the ownership/control exception, and its singular focus on pricing control rather than overall control or control over litigation decisions, run directly contrary to the law of this Circuit and the law of the case. Having already had the opportunity to consider Defendants' attempt to "revisit the MDL court's rulings" on "issues that they neglected to present in dispositive motions before the MDL court," this Court is well aware of the contours and policy rational of the exception developed in *Royal Printing* and its progeny. *See* Dkt. 558 at 3. As this Court noted:

> The *Royal Printing* court first announced the control exception in this circuit, holding that *Illinois Brick* "does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." Driving the court's decision was its recognition that it was unlikely that the direct purchaser would sue, because its "co-conspirator parent w[ould] forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                    28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the conspiracy." Although the court recognized a "small risk of multiple recovery" stemming from the small chance that a controlled subsidiary might sue, it accepted that risk where its "only alternative [was] to effectively immunize the transactions [before it] from private antitrust liability . . . ."

*Id.* at 8. (citations omitted).

As this Court recognized, *Royal Printing* unequivocally establishes the applicability of the exception where majority ownership exists, with no need to address actual exercise of control over the subsidiary's pricing decisions. And as the MDL Court recognized, "[t]he *ATM Fee* opinion never suggested any intention to alter the standard in *Royal Printing*." MDL Dkt. 7188 at 5. To the contrary, *ATM Fee* confirmed that majority ownership alone satisfies the exception, even absent any other indicia of control. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 757-58 (9th Cir. 2012) (explaining that control is established where "the shareholder owns a majority of the stock *or* has actual control over the corporation's conduct" and assessing whether defendants sufficiently controlled Concord's board of directors *or* its pricing power notwithstanding mere 10% ownership interest (emphasis added) (citing *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 506–08 (Del.2005))). As such, the Court did not err by applying the ownership/control exception as delineated by the Ninth Circuit and the MDL Court.

## C.     The Court Correctly Found That JVC Was Owned/Controlled by Conspirator Panasonic

Defendants contend that the Court erred in its findings permitting Costco's recovery of overcharges on purchases from JVC pursuant to the ownership/control relationship between JVC and conspirator Panasonic. Critically, Defendants do not dispute the Court's second conclusion of law that JVC was under Panasonic's control throughout the duration of the conspiracy. In light of the Court's prior rejection of Defendants' proposed date-of-suit rule, Dkt. 558, this finding alone is sufficient to establish Costco's right to recover for its JVC purchases. As such, Defendants' motion for amendment should be denied. *See Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1352 (9th Cir. 1985) (amendment not required if no impact on outcome of case).

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                    29

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

In any event, Defendants fail to demonstrate a manifest error requiring amendment of the Court's third conclusion of law regarding Panasonic's control of JVC after the conspiracy ended. Defendants claim that applying the control exception "when a conspirator has less than a majority interest in the direct purchaser is directly contrary to the holding of *ATM Fee*." Mot. 29. But as the MDL Court made clear, "the fact that a company's shareholder interest is less than 50% and/or representation on the board of directors of another company is less than 50% does not necessarily preclude control." MDL Dkt. 7422. Here, it was undisputed that Panasonic held an interest greater than 50% throughout the conspiracy and continued to hold a significant ownership interest after the conspiracy ended. This is a far cry from the situation in *ATM Fee*, where plaintiffs sought to establish control based upon a mere 10% ownership interest during much of the conspiracy period and thereafter. *See* 686 F.3d at 747-58. As such, the Court's third conclusion of law should stand. In any event, no amendment is warranted—and no reduction in the amount of judgment is needed—in light of the Court's second conclusion of law.

## IX. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions.


DATED: July 31, 2015

By: *s/ David J. Burman*
David J. Burman, WSBA #10611
Cori G. Moore, WSBA #28649
Eric J. Weiss, WSBA # 44807
Nicholas H. Hesterberg, WSBA #41970
Steven D. Merriman, WSBA #44035
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-8000
Email: DBurman@perkinscoie.com

*Attorneys for Plaintiff*
*Costco Wholesale Corporation*

COSTCO'S OPPOSITION TO DFTS' COMBINED MOTIONS
FOR JUDGMENT AS A MATTER OF LAW
(No. 13-cv-1207)                                    30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# CERTIFICATE OF SERVICE

I certify that on July 31, 2015, I electronically filed the foregoing **OPPOSITION TO DEFENDANTS' COMBINED MOTIONS FOR [1] JUDGMENT AS A MATTER OF LAW (FRCP 50); [2] IN THE ALTERNATIVE, FOR A NEW TRIAL (FRCP 59); AND [3] AMENDMENT OF FINDINGS IN BENCH TRIAL (FRCP 52(b))** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 31st day of July, 2015.

*s/David J. Burman*
David J. Burman, WSBA # 10611
DBurman@perkinscoie.com
**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorney for Plaintiff
Costco Wholesale Corporation

CERTIFICATE OF SERVICE
(No. 13-cv-1207)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000